ORLANDO ORANGE GROVES Co., *et al., v.* HENRY W. HALE, *et al.,* and MABEL B. McCUTCHEON, *et al.,* as Executors and Trustees under the Last Will and Testament of GEORGE D. McCUTCHEON, deceased.

161 So. 284.
Division A.
Opinion Filed April 29, 1935.

160

*Tilden & Hays, W. H. Poe, Dickinson & Dickinson* and *Pleus, Williams & Pleus,* for Appellants;

*E. W. & R. C. Davis,* for Appellees.

BROWN, J.—This suit was brought by certain minority stockholders, one of whom, Henry M. Hale, was a director, against the Orlando Orange Groves Company, a corporation, and its other directors and officers, and against J. P. Holbrook and the J. P. Holbrook Company.

This case has been before us before on an appeal from an order made December 30, 1931, granting, without notice, a temporary injunction, restraining the defendants, appellants here, from allowing any further withdrawals of the funds of the Orlando Orange Groves Company or any further dealings in the property of the Company, until further order of the court, and from an order denying a motion to dissolve the injunction. On the former appeal, this Court granted a supersedeas of the injunction pending the appeal, and on November 25, 1932, rendered an opinion and decision, wherein this Court reached the conclusion that "it has not been shown that the bill is without sufficient equity to authorize the chancellor to issue the said temporary restraining order;" and the orders appealed from were affirmed. See Orlando Orange Groves Co., *et al.,* v. Hale, *et al.,* 107 Fla. 304, 144 So. 674, wherein most of the allegations of the bill and answer are summarized.

The case is now before us on an appeal from the final decree, in which the chancellor denied the application for a receiver, and made no reference to the charges against F. H. Thwing, the president of the corporation, which were contained in the bill, and against whom an accounting was prayed as to certain purchases of corporate assets made by him, but did find that "the said J. P. Holbrook or J. P. Holbrook Company, acquired no interest or right to the

drawing account under said contract by virtue of the pre-
tended assignment from F. E. Baxter, and that the de-
fendants, J. P. Holbrook and J. P. Holbrook Company,
were not entitled to draw from said Orlando Orange
Groves Company in excess of $300.00 per month," and that
all moneys drawn in excess of said amount by J. P. Hol-
brook or J. P. Holbrook Company, unless warranted by
realized net profits, under and by virtue of said contract,
were improperly drawn from the Orlando Orange Groves
Company, and decreed that an accounting be had, at the
expense of the defendants, before a designated special
master, to ascertain, under certain rules laid down in the
decree, what amount, if any, was due the company by said
Holbrook and said Holbrook Company. The final decree
modified the injunction theretofore granted so as to enjoin
merely the payment by the defendants of any further
moneys of the company to Holbrook or the Holbrook Com-
pany on account of said contract until the further order
of the Court.

A motion filed by the complainants at the final hearing,
asking the Court to restrain the directors and officers of the
defendant corporation from paying, out of the funds of the
corporation, any solicitors' fees incurred in the defense of
this suit, was denied by the chancellor.

But the chancellor decreed that the defendants pay the
costs of the suit and the solicitor's fee of the complainant's
solicitors for the bringing and maintenance of the suit,
up to the entry of a decree on the accounting, the amount
of said fee to be determined when the special master's re-
port of said accounting came in.

It was also decreed that the individuals composing the
board of directors of the company (the complainant Hale
not being named), return to the treasury of the company

the sum of $5,100.00 paid to the J. P. Holbrook Company by authority of the board of directors after the supersedeas of the injunction order heretofore issued.

A petition for rehearing was made by the defendants, and denied, and the defendants took this appeal from the final decree and the order denying the petition for rehearing, filing some ten assignments of error, and the defendants, J. P. Holbrook and J. P. Holbrook Company, filed several additional assignments of error. Complainants filed two cross assignments of error, one going to the denial of their application for a receiver and the other to the denial of their motion that the officers and directors of the corporation be enjoined from paying any solicitor's fee incurred in the defense of this suit.

The transcript on this appeal, well prepared and carefully indexed, comes to us in ten volumes, comprised mostly of the testimony and exhibits introduced on the hearing before the special master.

We take it that the failure of the chancellor to order any accounting against the president of the Orlando Orange Groves Company, F. H. Thwing, with reference to the sale of certain securities of the corporation to him, or to even mention the matter in his decree, amounts to a vindication of Mr. Thwing from the charges made in the bill of improper conduct on his part in connection with the sale to him of such securities. In this conclusion the chancellor is amply sustained by the testimony. The applicable legal doctrine to this feature of the case was stated in our former opinion as follows:

"This court is in harmony with the view that a purchase by a director, officer, or agent of a corporation is not void, but is voidable at the option of the corporation, and that the burden of showing the validity of such a contract, and the

fairness and honesty of such a transaction with the corporation is on the director, officer, or agent. Chipola Valley Realty Co. v. Griffin, 94 Fla. 1151, 115 So. 541. See, also, 14a C. 120; 7 R. C. L. 760."

Neither the corporation itself, nor its board of directors, ever questioned these two transactions, one in 1930 and the other in 1931, by which President Thwing, a large stockholder in the company, purchased at one time certain notes and mortgages held by the company having a face value of about $39,000.00, for about $33,000.00, and at another time a note of the face value of $50,000.00, secured by mortgage, for which Thwing paid $47,000.00. The evidence shows that at the time these sales of securities to Thwing were made, the company was greatly in need of funds to meet pressing demands, upon which suits were threatened, and on account of the business depression and great financial stringency then existing, it was very hard, if not impossible, to raise money on securities of this nature. The evidence further shows that President Thwing purchased these securities at the urgent insistence of the manager, and that he paid for them their then full fair market value, or more, and that he would not have made these purchases at any such figures had it not been that he was heavily interested, as a stockholder, in the welfare of the company. So, if the burden of proof had been on Mr. Thwing to establish the fairness and validity and good faith of these transactions, such burden was abundantly borne. Indeed, the evidence shows that the Orlando Orange Groves Company was fortunate in having as its president, and as a large stockholder, a man of means, who could, and did, come to its aid in a time of imperative need.

Nor does the evidence sustain the charge made in the bill that the officers and members of the board of directors

of the defendant corporation (excepting from such charge, of course, Mr. Hale, one of the complainants), were "dominated and controlled by the defendant, J. P. Holbrok. The testimony of the directors indicates that they, or most of them, were active business men of Orlando, men of affairs, who could not easily be dominated or controlled by any one, and certainly not by a man who held his position with the corporation under a contract which by its terms the directors could have terminated at any time. The directors who took the stand and testified in regard to this charge, as well as to the charges made against President Thwing, were C. DeWitt Miller, M. O. Overstreet, Clarence Brown, E. C. Duckworth, L. M. Robertson, J. P. Holbrook and N. P. Yowell, all residents of Orlando, and F. J. Thwing, a resident of Kansas City, Mo., who spent a large part of each year in Orlando. They testified that Holbrook never at any time made any attempt to influence their action as directors, either individually or as a board; that he never approached them in advance of a meeting to find out how they would vote, or to influence their vote, on any proposition that was to come up; that when he had any matter to bring before the board, he did so in open meeting, presented the facts and discussed the proposition on its merits, without attempting any high pressure methods, and left it up to the board of directors to take such action as they saw fit. These defendant directors were more heavily interested in the financial welfare of the corporation than the complainants, as they owned 853.95 shares of the company's stock, whereas the complaining minority stockholders owned only 257.25 shares. The total number of shares of capital stock issued and sold by the corporation amounted to 3,973.55 shares of a par value of $100.00 per share; so the minority stockholders who filed this bill owned a fraction

over six per cent. of the capital stock. The evidence does show that the defendant members of the board of directors had great confidence in Holbrook and high regard for his business ability, and considered that he had rendered very efficient and valuable service to the corporation during the period of about ten years in which he had been connected with it. Their appreciation for what Holbrook had done for the corporation may have caused them to be fairly generous in their dealings with him, but the charge that he dominated and controlled the board of directors is certainly not sustained by the evidence in the case, and not a single one of the complaining minority stockholders took the stand in this case to testify in support of this or any other charge made by them in their bill, nor was the testimony of any of them taken by deposition.

The most that can be contended in behalf of the complainants in the court below, appellees here, on the evidence, is that the board of directors may have made some mistakes of judgment; that throughout this ten year period, they honestly misconstrued, or consciously modified, the contract originally made by the company in 1921 with Baxter and Holbrook, which contract, with the company's approval, Holbrook took over after Baxter's retirement in 1923, and which Holbrook some years later assigned to his own corporation which he owned and controlled, the J. P. Holbrook Company, and that as a result of such misconstruction, or modification by mutual consent, the directors allowed Holbrook a larger drawing account than the contract as originally written entitled him to, and also allowed him to make withdrawals in anticipation of future net profits, which the contract properly construed, did not warrant. We apprehend that it was on some such theory as this that the chancellor based his decree, for he denied the

application for a receiver and left the corporation, which was in a good and solvent condition, in the hands of the directors thus attacked.

We might well pause here to consider this question: Even though it be admitted that the directors woefully misconstrued, or incorrectly applied, or, by mistake of judgment, in effect modified or changed the said contract, and had allowed and were allowing Holbrook to draw more money than he was entitled to under the original contract; there being no question of *ultra vires* action and no evidence of fraud or conspiracy or bad faith on the part of the directors, or that they or either of them, except Holbrook himself, ever received a penny of the money thus withdrawn by Holbrook, did the complaining minority stockholders have any right, under the evidence in this case, to file this suit without first making an honest effort to get redress of their grievances within the corporation? On the facts alleged in the bill, which alleged that the corporation had been managed and its finances handled in such a manner as to greatly and unjustly enrich the secretary and treasurer, J. P. Holbrook, and the president, H. H. Thwing, to the detriment of the stockholders, and that Holbrook had at all times dominated and controlled the board of directors, we held, on the former appeal, that it was not necessary for the bill to show that the complainants had first requested the board of directors to institute proceedings in the name of the corporation to obtain the relief sought in the bill, because the facts alleged indicated that such request would have been unavailing and would not have served any useful purpose, and would have been tantamount to requesting the directors to sue themselves. But, as we have seen, the complainants did not prove the alleged unjust enrichment of the president of the corporation to

the detriment of the stockholders, nor that Holbrook controlled or dominated the board of directors, nor that the board of directors had been guilty of any actual fraud or bad faith in their construction, or modification, or novation, of the contract, on which Holbrook was permitted to make the withdrawals of funds complained of, regardless of whether or not such withdrawals were in excess of those allowable under his contract when correctly construed— a matter which we will later discuss; nor did they prove any right of recovery against the directors as individuals, unless it be as against Holbrook himself.

It is therefore extremely doubtful, under the rules laid down in our former opinion, strictly construed, whether the complaining minority stockholders, have, by the evidence, shown a right to seek relief in the courts without first having applied to the board of directors for such relief, which they did not do. But we are convinced, from a reading of this record, that neither the directors nor the stockholders would have granted the relief sought by this bill. Whether right or wrong, the directors, and the overwhelming majority of the stockholders, are shown by this record to have been strongly of the opinion that the practices complained of by the minority, at least in so far as they were proven by the evidence, were right and justifiable under the circumstances, and for the best interests of the corporation, and it is quite clear that any application to them by the minority stockholders for the relief sought by the bill would have been useless and unavailing.

Even though there was no sufficient proof that the directors were dominated or controlled by Holbrook, or that there was anything wrong or unlawful in connection with the sale of certain corporate securities to President Thwing, there remains the charges of illegal and excessive allow-

ances to Holbrook—an alleged unlawful waste of corporate assets—which it is claimed should be redressed by an accounting or suit on account of past transactions, and further future allowances stopped by injunction. The mere fact that in all these matters the directors were not guilty of any actual fraud, would be no defense, if, as a matter of fact, by their gross misjudgment or ignorance of the legal rights of the corporation, they had permitted and were continuing to permit an illegal misapplication or waste of corporate funds, to the detriment of the corporation and its stockholders. And the doctrine laid down in our opinion on the former appeal in this case might well be extended to that extent; that is, in such a case, where it is made clear that an appeal to the directors or stockholders to protect the corporate interests would be futile and unavailing, the stockholder may apply to the courts for appropriate relief. 14 C. J. 879; Pomeroy's Equity Juris. Vol. 3, Section 1094; Montgomery Traction Company v. Harmon, 140 Ala. 505, 37 So. 371. But, as was said in our former opinion, a court of equity will not attempt to pass upon questions of mere business expediency, or the mere exercise of that business judgment which is vested by law in the governing body of the corporation.

It therefore becomes necessary for us to consider these particular charges relating to Holbrook's drawing account and alleged excessive withdrawals in violation of his contract. In doing so, it might be well to bear in mind that:

"A very wide discretion is necessarily imposed in the directors of a corporation. It is not the duty of the managers of such association to bring suit upon every supposed wrong or injury to the corporation. * * * So a suit might appear so desperate, or be so expensive, or for good reasons impolitic, that creditors might, in the exercise of a sound

discretion, deem it unwise to engage in litigation. In such case, if the refusal be in good faith, the courts will rarely suffer a shareholder to overturn such decision by entertaining his suit for the same cause of action." Wallace v. Lincoln Savings Bank, 15 S. W. 448, citing Morawitz Priv. Corp., Sec. 244; Moore v. Silver Valley Mining Co., 10 S. E. 679.

The contract which is referred to in the bill and in the court's decree was executed on Sept. 9, 1921, by Orlando Orange Groves Company, a Florida corporation, by T. Picton Warlow, its then president, and F. E. Baxter and J. P. Holbrook, who were stockholders in the company. They had had considerable experience in the real estate business and some experience in the planting, cultivation and development of orange grove properties. At the time this contract was made, the corporation was in a bad way financially. Organized to develop a large tract of wild land into orange groves for purpose of sale, the company had, as Judge Warlow expressed it, "reached the end of its tether" when Baxter and Holbrook were induced to enter into this contract, which was drafted by the company's president, Judge Warlow, who was with the company from its organization, until 1927.

The contract provided that Baxter and Holbrook shall be "General Managers and Sales Agents, whose duties it shall be to have complete charge of the assets of the company and the development and sale of the 4,000 acre tract owned by the company, subject only to the general supervision and control of the company."

It is not necessary to set out the contract in full. The chief controversy is as to the proper construction of the following clauses:

"It is agreed that the said Baxter and Holbrook as com-

pensation for their services, shall receive 50% of the net profits derived from the company's business and sale of land. All expenditures that have been made in the past on account of the purchase of land, development of same, or otherwise, as shown by the books of the company, together with all expenditures for sale or development of the property in the future, taxes and other incidental expense, shall be chargeable against the gross profits. The said Baxter and Holbrook do hereby agree that they will at their own expense and without charge to the company (other than extra help needed for the company's business) maintain the offices necessary for the transaction of the company's business, and make no charges for their own services."

"The books shall be kept at the expense of the company, chargeable against the gross earnings, and shall, together with all papers, letters and documents connected with the business, be at all times open to the inspection of the company. An annual statement of accounts shall be rendered on the first day of August each year, and should there be accrued profits not used in further development of said property, the same shall be divided."

"It is agreed that the said Baxter and Holbrook may from time to time draw such sums, not to exceed $300.00 per month apiece, for their personal expenses, which amount, however, shall be chargeable against their proportion of the net profits."

Baxter assigned his interest in this contract to Holbrook on May 10, 1923. Baxter & Holbrook had been partners, and Baxter's interest in the partnership and assets, including his rights and interest in this contract, were sold and transferred to Holbrook. The assignment by Baxter to Holbrook of this contract was approved by resolution of the board of directors of the Orlando Orange Groves Com-

pany. Holbrook carried on the work of the company from that time on and was allowed the full drawing account of $600.00 per month which had formerly been allowed to Baxter and Holbrook together. He also acted as Secretary and Treasurer of the company. His subsequent assignment of his interest in the contract and the profits coming to him thereunder, in 1929, to his own corporation, the J. P. Holbrook Company, does not appear to have had any practical effect, so far as the Orlando Orange Groves Company was concerned. While the board of directors of the latter company approved this assignment to Holbrook's corporation, J. P. Holbrook, apparently the *alter ego* of the J. P. Holbrook Company, of which he held the majority of the stock, continued as before to carry on the work required by the original contract. In 1929, a resolution was adopted by the directors of the Orange Grove Company authorizing said company and the J. P. Holbrook Company to lend money each to the other as circumstances required, but no loans were made under this resolution, and it was rescinded and set aside by the directors of the Orange Grove Company in 1931. However, during several years prior to 1929, Holbrook and the Holbrook Company had made various loans to the Orlando Orange Groves Company, aggregating about $55,000.00, but these loans were all repaid.

While Judge Warlow, a resident of Orlando since 1884, and who was president of the corporation from its inception until about four years before this suit was brought, was being examined as a witness, he testified in part as follows:

Q. "Judge, this contract between the company and Baxter and Holbrook and later Holbrook bought out Baxter and Baxter assigned his interest in the contract and I think

finally after you got out it was assigned to J. P. Holbrook Company, that is the drawing account, did it contain this clause: 'It is agreed that the said Baxter and Holbrook draw such sums, not to exceed $300.00 a month apiece, for their personal expenses, which amount, however, shall be chargeable to their proportion of the net profits.' will you please state how the Board of Directors and the company dealt with Baxter and Holbrook and then Holbrook, applied that in dealing between the company and then on that contract?"

A. "At the time they took on this contract they were to give their entire time and attention to just this business and my understanding of the meaning of that contract and the way in which it was in point of fact carried out was that they should draw that amount monthly right along."

Q. "That was regardless of net profits?"

A. "Before there could be any net profits."

The testimony of the various directors shows that the corporation had construed the contract to mean that Holbrook and Baxter were each entitled to draw $300.00 a month, irrespective of whether or not any profits were made, and that after Holbrook bought out Baxter in 1923, the corporation through its board of directors approved the transfer, and perhaps in recognition of the fact that Holbrook had taken over the entire management and was doing all of the work, acted upon the assumption that under the contract Holbrook was entitled to draw $600.00 per month from that time on, regardless of whether any profits were made or not. This course was pursued for some six years until Holbrook, in February, 1929, reported to the board that he had assigned his interest in the contract to the J. P. Holbrook Company, and from then on the corporation paid the J. P. Holbrook Company the $600.00 per month.

Thus the corporation, acting through its governing body, approved, recognized and acted upon the various assignments of this contract and accepted the performance of the same from the respective assignees over a period of six years in one instance, and up until the institution of this litigation in the second instance. Before this suit was filed, on December 7, 1931, the board of directors determined that all drawings on the part of Holbrook were to cease December 31, 1933, and should be limited to $600.00 per month, and in May, 1932, after this suit was brought, the board of directors reduced Holbrook's drawing account to $300.00 per month from July 1, 1932, until the end of the year, after which time no further withdrawals of any kind would be permitted.

Appellees contend that the original contract was a contract for personal services and hence not assignable. The general rule is that contracts involving relations of personal confidence and personal services are not assignable, but such contracts may be assigned by consent of parties. The acts and conduct of a party to a contract, with knowledge of the fact that it has been assigned, may be such as to warrant the conclusion that a provision in the contract against assignment has been waived, as where work has been performed and been accepted. 5 C. J. 885, 884, Section 49.

Assuming that this contract was a personal contract, yet when the contract was actually assigned to Holbrook, and the assignment was approved by the corporation, which thereafter dealt with Holbrook as if the contract had been made originally with him, and the parties acted upon this basis for several years, Holbrook managing the affairs of the organization, which services were accepted by the corporation, and the latter allowing him a drawing account of

$600.00 per month, something in the nature of a novation occurred, or at least a modification of the contract with the consent of the parties thereto, which neither the corporation, nor its board of directors, nor its stockholders, could afterwards repudiate. 46 C. J. 576.

In the case of Lobee, *et al.*, v. Denby Motor Truck Co., 163 N. Y. Supp. 951, the Truck Company had entered into a contract with Frank A. Lobee, which had a specific provision that such contract should not be transferable. Frank A. Lobee thereafter formed a partnership with his son, of which the corporation had notice. Thereafter the corporation did business with the partnership of Frank A. Lobee and Son under said contract. In an action against the corporation for breach of contract, the corporation raised the question that the contract was with Frank A. Lobee alone and not with the firm and that the contract provided in express terms that it should not be assignable. The Supreme Court of New York disagreed with that contention, however, stating: "We are of the opinion that the evidence shows that the defendant accepted the new firm as the persons with whom it had dealt under the contract in question and acted accordingly. The dealing amounted in law to a novation."

It is a well settled principle that the assent to, and the acceptance of, the terms of a novation of a contract need not be shown by express words to that effect, but the same may be implied from the facts and circumstances attending the transaction and the conduct of the parties thereafter. 46 C. J. 580; Bryan, Keefe & Co. v. Howell, 109 So. 593, 92 Fla. 295.

So, as long as there is no question of public policy involved, and none is involved here, the assignability or non-assignability of a contract really has no application in de-

termining whether a novation occurred. A non-assignable contract may be novated as easily as an assignable one, because, in a novation, the primary element is the consent of the parties. Where all the parties involved in a particular contract, consent to the novation, the novation is, by that consent, accomplished.

It is true that under the original contract, the corporation was to get the services of two men. The consideration was that these two men were to receive one-half the net profits derived from the company's business and the sale of the land and the other was that they should be allowed to draw $300.00 per month each, said amount to be chargeable against their proportion of the net profits. It is also true that by the assignment from Baxter to Holbrook, the corporation would get only the services of one man, but the evidence in the case undoubtedly shows that the defendant accepted Holbrook in the place of Holbrook and Baxter and that they dealt with him from the beginning upon the basis that he was entitled to the full amount of drawing account which had theretofore been paid to Holbrook and Baxter together, and both parties acted in accordance with this understanding of the situation created by said assignment. It is not denied, as we understand it, either by the parties or by the chancellor who tried this case, that under this contract Holbrook acquired Baxter's rights insofar as the contract gave to Baxter and Holbrook the right to receive 50% of the net profits. And if the parties understood, as the evidence indicates that they did, that Holbrook should also, by reason of such assignment, which was approved by the board of directors, receive the full drawing account of $600.00 per month, and acted upon this understanding for a period of several years, we think ordinary good faith requires that the parties stand by it, whether it be called a

practical construction of the contract agreed to by the parties, or a modification of the contract by mutual agreement, or a change or a novation by mutual consent. The result would be the same. The same thing would apply to the assignment by J. P. Holbrook to the J P. Holbrook Company, which was also formally approved by a resolution of the board of directors and which was acted upon by the parties as being binding upon them for a period of some two years or more before this suit was brought. Indeed, for the reasons above pointed out, the assignment from Holbrook to the Holbrook Company was more or less of a formality so far as the corporation was concerned, as Holbrook continued to render the same kind of services which he had been rendering before.

The testimony in the case shows that after the assignment from Baxter to Holbrook in 1923, Baxter dropped entirely out of the picture. He in no way attempted to carry on any other duty under the contract or to claim any compensation thereunder. The corporation had no more to do with Baxter. It discharged him from all liability, looked wholly thereafter to Holbrook to fulfill the contract, and turned over the entire drawing account of $600.00 per month to Holbrook alone, and thereafter by credit or by cash gave to Holbrook 50% of what they considered to be the accrued profits of the corporation as shown from year to year by the annual statement of the corporation. Holbrook entirely assumed all the burdens and obligations, the duties and liabilities, under the contract that were formerly assumed by the partnership of Baxter and Holbrook, and the financial condition of the corporation was very much improved as a result of his labors and management. The directors of the corporation testified positively that after Baxter assigned his interest to Holbrook they dealt with

Holbrook under the terms of the contract just as they had, before such assignment, dealt with the partnership of Baxter and Holbrook; and that after Holbrook had assigned to J. P. Holbrook Company, they dealt with J. P. Holbrook Company in the same manner.

We are therefore of the opinion that the chancellor erred in holding that the defendants, J. P. Holbrook and J. P. Holbrook Company were not entitled to draw from the Orlando Orange Groves Company in excess of $300.00 per month.

Under the contract above referred to, the manager was required to furnish an office for the corporation. This was done, but the directors, early in 1924, entirely of their own volition, decided that the corporation should have more elaborate and expensive downstairs offices, and they arranged with Manager Holbrook to procure the same at a rental of $400.00 per month, Holbrook to pay $100.00 per month out of his drawing account, and the corporation to pay $300.00 per month. This arrangement was approved at the stockholder's meeting in January, 1924. In the light of the principles above discussed, could these minority stockholders, suing on behalf of the corporation in December, 1931, recover from the manager the $300.00 per month rent, paid by the corporation? Manifestly they could not. They, by their action, acceded to by Holbrook, modified the original contract in this respect, and waived the provision that the manager should furnish an office entirely at his own expense. This lease was later reduced to $300.00 per month, and shortly thereafter the corporation got out from under this lease, and moved into less expensive quarters, finally landing back in the original quarters furnished by Baxter and Holbrook, at a rental of $25.00 per month for the same offices for which Baxter and Holbrook had paid

$60.00 per month ten years earlier. The increased cost of office rentals, above mentioned, being due to the voluntary action of the board of directors, the evidence would not justify charging this additional expense to Holbrook.

Indeed, when tested by the evidence, none of the other charges made in the bill of complaint are sufficiently sustained to require any discussion except the charge that the board of directors permitted Holbrook, or the Holbrook Company to make certain heavy withdrawals of company funds, in addition to the regular monthly drawing account above discussed, during the years 1928-1931; namely, $15,650.00 in 1928, $14,200.00 in 1929, $21,119.44 in 1930, and $11,101.00 in 1931, notwithstanding the fact that no dividends had been declared by the corporation. The answer virtually admits these withdrawals, except the amounts, alleging that at the end of 1929, the Holbrook Company was overdrawn only to the extent of $3,073.73; at the close of 1931, in the sum of $4,220.27; but admits that the overdrawing in excess of the monthly drawing account for the year 1931, was the amount alleged in the bill, i. e., $11,101.01; but that all of said overdrafts were properly chargeable against accrued or anticipated profits, and the amount thereof fully secured by the interest of Holbrook and the J. P. Holbrook Company in such accrued or anticipated profits. Also that there had been set up out of the earnings of the company a reserve of $46,942.29, for certain contingencies, which had not arisen, one-half of which would belong to the Holbrook Company when diverted to surplus. While there is some controversy as to the amounts of these withdrawals, which were made in excess of the regular drawing account of $600.00 per month, the main controversy is whether they were legally allowable under the

contract. The directors claim that they were justified in permitting these withdrawals by the terms of the contract.

In our former opinion, attention was called to that provision of the contract which gave Baxter and Holbrook "50% of the net profits derived from the company's business and sale of land," and in that connection we said:

"The contract giving the amount of Holbrook's compensentation and how it was to be paid does not state when the 'net profits' of the corporation, of which Holbrook and Baxter were to receive fifty per cent should be ascertained, nor what is to be considered in arriving at the 'net profits.' In the absence of a definite agreement, we hold with the Texas Court of Civil Appeals, that net profits, generally speaking, implies what remains in the conduct of a business after deducting from its total receipts the expenses incurred in carrying on the business and that to such expenses may be charged taxes, upkeep, depreciation and interest on the corporation's debt, but not interest on its capital, and that as a general rule, any loss in the capital stock must be replaced before estimating earnings. Dealers Granite Corp. v. Faubion, 18 S. W. (2nd) 737, cited in 76 A. L. R. 887."

We adhere to this as a general definition of net profits when, as stated, there is an "absence of a definite agreement" to the contrary.

But the defendant directors call attention to the other clause of the contract, to the effect that "An annual statement of accounts shall be rendered on the first day of August of each year, and should there be *accrued profits* not used in further development of said property, the same shall be divided." Divided between whom? Between the parties to the contract—that is between the corporation on the one hand and Baxter and Holbrook (or their successors in interest, J. P. Holbrook Company), on the other, on the basis

of one half to each, being the only basis of division men-
tioned in the contract. And it is further insisted that in
annually ascertaining the "accrued profits," the contract
does not mean that cash alone shall be considered, ignoring
the value of notes and mortgages and other property re-
ceived in the course of corporate business in the sale of
corporate property. Such is the contention of the defendant
corporation and its directors.

They further contend that the books of the corporation
were so kept as to set up as "accrued profit," the difference
between the selling and cost prices of the land, treating de-
ferred payments secured by notes and retained titles, or by
notes and mortgages, as assets. The board of directors
construed the contract to entitle the manager to an annual
division and payment to him of 50% of the "accrued prof-
its" so computed, when funds of the corporation not used in
further development were available. Statements showing
the amount of the "realized" and "anticipated" profits
(which they contend, when combined, amounted to the "ac-
crued" profits), together with the amount of money that
had been paid to the manager, were annually submitted to
the stockholders, and were approved by them at their reg-
ular annual meeting. Therefore, they contend that, after
such a course of dealing over a period of some eight or
ten years, five stockholders cannot come into a court of
equity and question the construction thus placed upon the
contract.

The complainants, on the other hand, contend that in
any event, under either clause of the contract, the holders
of the contract were only entitled to fifty per cent of the
*net profits* derived from the business, after deducting the
monthly allowance under the contract, and that neither un-
realized nor anticipated profits, even though represented by

notes secured by mortgage or retention of title, could be considered in arriving at any profits in which Holbrook was entitled to share.

Even though it be admitted that the words used are ambiguous, and that just what the parties meant by using the term "accrued profits" in that clause of the contract providing for an *annual* division of "accrued profits" is a somewhat debatable question, it is quite certain that they could not have had in contemplation the ultimate making of actual net profits, because such ultimate net profits could not be ascertained until the corporation should be finally wound up, for profits made one year may be lost in a later year. If that had been the meaning, there could have been no annual division whatever of "accrued profits," or any kind of profits, whereas the contract plainly provided for "an annual statement of accounts" and an annual division of "accrued profits," if any, "not used in further development of said property."

It has not been suggested that the directors profited by the alleged unlawful payments to Holbrook of one-half of the "accrued profits." If there had been any fraud or collusion, these payments would doubtless have been concealed or disguised. But it appears that everything was open and above board and that at every stockholders' meeting there was a full disclosure of all payments made to Holbrook, and the balance sheets in evidence were freely circulated among the stockholders, and no objections were made as to such payments. None of these five minority stockholders took the stand to explain their delay in raising the objections made in their bill. When Holbrook and Baxter took over the affairs of the corporation, its capital was impaired and it was heavily in debt. Its condition was desperate and apparently hopeless. This no doubt accounts for the liberal

character of the contract which the company offered to Holbrook and Baxter. During the trying years when the company was struggling to get on its feet, and required at its head a man of the energy, enthusiasm and resourcefulness of Holbrook, no complaint was made from any quarter as to Holbrook's share of the profits. There was nothing to fight over then. But there appears to have been something over half a million assets when this suit was filed. Nor was any complaint ever made later, on this score, to the officers and directors, or at any stockholders' meeting, up to the time this suit was brought.

The evidence shows (contrary to a surmise contained in our opinion on the former appeal) that during the real estate boom, grove properties were practically unsalable, the boom being confined principally to town and subdivision lots and undeveloped lands; that after the boom, and until the great economic depression set in, grove properties were in demand, and it was during this period that the company made a large portion of its sales, and that collections thereon had been fairly good down to the time this suit was tried. And even after the depression was on, in 1930, the company, through Holbrook's efforts, effected the largest sale in its history, by which it received $94,000.00 in cash and $200,000.00 in four $50,000.00 notes, payable in 1931, 1933, 1934, and 1935 respectively.

Counsel for appellees, consistently with their contention that the only question involved in the case is one of "net profits," cite a number of cases holding, in the main, that net profits mean the excess of income over outgo, or the excess of receipts over disbursements. So they do not cite any cases construing the meaning of the words "accrued profits."

Counsel for appellants cite several cases indicating that

an *accrued* profit or loss, asset or liability, is one that has become fixed and ascertained, although not yet realized in cash, or due and payable. See U. S. v. Anderson, 269 U. S. 422, 46 S. C. 131, 70 L. Ed., 347; U. S. v. Mitchell, 271 U. S. 9, 46 S. C. 418, 70 L. Ed., 799; Lucas v. Ox Fibre Brush Co., 281 U. S. 115, 50 S. C. 273, 74 L. Ed., 733; Lucas v. American Code Co., 281 U. S. 445, 50 S. C. 202, 74 L. Ed., 538; Aluminum Castings Co. v. Routzaker, 282 U. S. 92, 51 S. C. 11, 75 L. Ed. 234; Hart v. Commissioners, 54 Fed. (2d) 848 Alker v. U. S, 47 Fed. (2d) 229.

In the case of Lichtenberger-Ferguson Co. v. Welsh (C. C. A.) 54 Fed. (2d) 570, it was said:

"Under the accrual system of accounting, where an item is definitely ascertained as to its amount, and acknowledged to be due, it has "accrued." To quote from the decision of the United States Board of Tax Appeals in the case of Clarence Schock, 1 B. T. A. 528, 'Under such system of accounting *receipt* of income—actual or constructive—is not essential to constitute income within the statutory definition of income. Under an accrual system of accounting one *accrues* income, he does not *receive* it. Under the receipts and disbursement method, one *receives* income and does not accrue it.' "

The word "profits," standing alone, has perhaps received a greater variety of judicial interpretation than any other one word known to the law. See 50 C. J. 641-649. Some courts hold that the word is ambiguous; some to the contrary; so this word, in and of itself, can hardly be said to have any well defined legal meaning.

The last edition of Webster's New International Dictionary, quite recently published, gives, as the legal meaning of the word "accrue": "To come into existence as an enforce-

able claim; to vest as a right; as a cause of action has accrued when the right to sue has become vested."

The same dictionary defines "accrued liability" as follows: "That portion of an accruing liability which has become definitely ascertainable and chargeable although actual payment thereof may not yet be due." And the same dictionary defines the words "accrual basis" as applied to accounting, as follows: "A method of keeping accounts which shows expenses incurred and income earned for a given period, although such expenses and income may not have been actually paid or received in cash."

We hardly think it necessary to comment further on the meaning of the term "net profits" as used in the first part of the contract hereinabove quoted from. But that provision of the contract which contemplates an annual division of the "accrued profits" cannot be ignored. Appellants contend that these words mean the excess of assets over liabilities, and that the test as to whether they should be divided between Holbrook and the corporation, or be used in further development, was a question for the board of directors to decide. They also insist that accrued profits should be divided into two parts—"realized profits," being that portion which has been received in cash, and "unrealized profit," being that portion represented by deferred assets, such as contracts and notes, secured and considered good, together with all other assets, after deducting liabilities.

It is elementary that the main principle in the construction of a contract is to arrive at the intention of the parties, deduced from consideration of the whole instrument, in the light of the object to be gained, the situation of the parties, the information in their possession and the practices existing at the time the contract was made.

The accrual method of accounting has existed for a long

time. It has been recognized by the Government of the United States in connection with the enforcement of the income tax law. Under this method of accounting, bills receivable are treated as assets and bills payable are treated as liabilities. The evidence shows that the accrual method of accounting had been adopted by the corporation before the contract was entered into by it and was continued for some years thereafter. No doubt both contracting parties were familiar with the way in which the books were kept before and at the time of making the contract, and that they contracted with reference to the method of accounting thus actually employed when they referred to "accrued profits." Their practice and understanding in that regard continued from the inception of the contract down to the time this suit was brought, with the knowledge and acquiescence of the stockholders, although for several years after the contract was made the profits were used in development and Holbrook advanced money to the corporation rather than receiving his share of the profits. Where the evidence shows what the parties have voluntarily done over a considerable period of time, under a contract, this is very persuasive of the meaning of the contract, but it so happens that in this case the parties acted in pursuance of what appears to be the legal meaning of the terms used, from the cases above cited. That is, to put it more concretely, the parties treated the deferred payments secured by notes and mortgages, or by notes and retained titles, as assets in arriving at 50% of accrued profits to which the manager was entitled, when funds of the corporation not used in further development were available.

Evidently the parties construed the contract to mean that the first day of August of each year, the books should be balanced and a statement of accounts should be rendered, and

if it appeared that a profit had accrued, Holbrook should be paid his share, unless, in the judgment of the directors, the cash available was necessary for further development. The courts should hesitate and consider carefully before applying interpretations of contracts which the courts deem technically correct, to past transactions already completed during the time that the parties mutually interpreted the contract differently. Where a contract has been executed or partly performed, in accordance with a practical construction of its meaning placed upon it by the parties themselves, the courts are slow to compel the parties to uproot what has been done and make reparation therefor upon a different construction placed thereon by the courts, unless the plain language of the contract imperatively requires it.

This court is committed to the doctrine that where the terms of a written contract are in any respect uncertain or doubtful and the parties thereto have by their conduct placed a construction upon the contract which is reasonable, such construction will be adopted by the court upon the principle that it is the duty of the court to give effect to the intention of the parties where it is not wholly at variance with the principles of correct legal interpretation of the terms of the contract. Webster v. Clark, 34 Fla. 637, 16 So. 601, 27 L. R. A. 126, 43 A. S .R. 217; Scotch Mfg. Co. v. Carr, 53 Fla. 480, 43 So. 427; Mizell Live Stock Co. v. McCaskill Co., 59 Fla. 322, 51 So. 547; Peoples Savings Bank & Trust Co. v. Landstreet, 80 Fla. 843, 87 So. 227; Sahlberg v. Geague Furniture Co., 100 Fla. 972, 130 So. 432.

Applying this principle to the clause of the contract above discussed, our conclusion is that the practical construction placed thereon by the Board of Directors, over a considerable period of years, in treating deferred payments secured by notes and mortgages, or by the retention of title

contracts, as assets, in annually ascertaining the amount of accrued profits, should not be disturbed, and that in holding to the contrary, the learned chancellor, was, in our opinion, in error.

As hereinabove stated, a temporary injunction was granted by the circuit court enjoining the directors from paying any further sums to the manager. This injunction was superseded by an order of a Justice of this Court and upon the filing of a bond. The manager continued his services and was allowed a drawing account during the period of the interlocutory appeal. About a year later the order granting the temporary injunction was affirmed. During that period, the sum of $5,100.00 had been paid to the manager, and in his final decree, the chancellor decreed that the directors of the Orlando Orange Groves Company should return to the Treasurer the sum of $5,100.00 so paid after the injunction had been superseded and before the same had been reinstated.

This portion of the court's final decree is, in our opinion, contrary to the principles laid down in the case of Powell v. Florida Land & Development Company, 41 Fla. 494, 26 So. 700, and cases therein cited. In the opinion in that case, it was said: "The clear effect of the decision in Jacoby v. Shoemaker, 26 Fla. 502, 7 So. 855, is to hold that a supersedeas upon an appeal from an order granting an injunction, operates to prevent the court from enforcing the injunction and thereby enables the parties enjoined to do those things which the injunction forbids without fear of punishment during the pendency of the supersedeas."

And in State v. Johnson, 13 Fla. 33, it was held that a supersedeas upon appeal from an interlocutory order appointing a receiver *pendente lite* superseded the power of the court and its officers in reference to the order, and that any

action by any person under such order, in disregard of the effect of the supersedeas, would constitute a contempt of the appellate court, and that the effect of the supersedeas in such a case would require the receiver to restore the property in his possession to the hands of the defendant from whom he had received it by virtue of the order appealed from.

As a corollary to this we have held that supersedeas from an order dissolving an injunction operated to restore or reinstate the injunction.

There was no prayer in the bill for anything but injunctive relief as against the directors. It being clear from the above case that the Orlando Orange Groves Company had the right to continue paying Holbrook his said drawing account after the supersedeas order issued and before the affirmance of the interlocutory injunction, it is beyond the power of the Circuit Judge to order the directors to pay into the treasury of the company money which this court had in effect authorized them to pay out to the Holbrook Company on the drawing account and which they had so paid out. The directors never received this money themselves, and, if we desired to be technical, we might observe that the directors could not "return" what they had not received. If the corporation has been injured by the action taken on the part of the board of directors, its remedy, if it has any, would be to sue for a breach of the supersedeas bond. In La Belle v. Campbell, 128 So. 422, 99 Fla. 1125, it was said in the opinion of Mr. Justice BUFORD: "This bond, which was a supersedeas bond on appeal, is a contract of indemnity between the parties, and, there being no statutory provision providing for the entry of summary judgment upon such a bond, the parties are limited to their remedy at law to recover such damages as they may show they have sustained

by reason of the taking of the appeal. See Fidelity & Casualty Co. v. D. N. Morrison Construction Company, 126 So. 151, 99 Fla. 309."

For the reasons pointed out, the decree appealed from must be reversed, with directions to dissolve the temporary and permanent injunctions and dismiss the bill of complaint.

Reversed.

WHITFIELD, C. J., and DAVIS, J., concur.

ELLIS, P. J., and TERRELL and BUFORD, J. J., concur in the opinion and judgment.