CHARLOTTE HARBOR AND NORTHERN RAILWAY COMPANY, A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF FLORIDA, *Plaintiffs in Error,* v. BLAIR BURWELL, JUNIOR, AND CHARLES E HILLYER, COPARTNERS DOING BUSINESS AS BURWELL & HILLYER, *Defendants in Error.*

1. Where a contract is entered into not under seal between a railway company of the one part and a firm of contractors of the other, for the construction of certain trestle and bridge work, and among other things provides that no claim for extra work shall under any circumstances be allowed or considered unless the same shall have been done in pursuance of an order in writing given by the engineer, but nothing shall be deemed or construed as extra work which can be measured and estimated under the terms of the contract, such a provision, and other like ones, intended for the benefit of the railway

company, while legal, may be waived, and such waiver may be shown by the subsequent course of dealing between the parties.

2. In a suit to recover for work and materials when the compensation therefor is not fixed by contract, it is essential to a recovery that there should be proof of the reasonable value of such work and materials, and the evidence of the plaintiff that he paid a sub-contractor for this work upon estimates furnished by a resident engineer of the defendant is not sufficient proof of such reasonable value.

3. Where the owner of certain crushed granite offers to sell the same to a party upon whose premises the rock is located, and the latter agrees to buy the same, but there is nothing given by way of earnest to bind the bargain or in part payment, and no note or memorandum in writing of the bargain or contract signed by the parties or their agents thereunto lawfully authorized, it is essential to a consummated sale under the Statute of Frauds (sec. 2518 Gen. Stats. of 1906) that the alleged purchaser should have done some act showing an acceptance of the rock; as for instance that he sold or attempted to sell or dispose absolutely of the whole or some portion of the rock, or alters its nature, or the like, and such facts must be clearly shown.

This case was decided by Division B.

Writ of Error to the Circuit Court for Duval County.

The facts in the case are stated in the opinion of the Court.

*Cooper & Cooper* for plaintiff in error;

*Kay, Doggett & Smith* for defendants in error.

HOCKER, J.: On the 18th day of July, 1907, the defendants in error, whom we shall term the plaintiffs,

brought an action of general assumpsit against the plaintiff in error, treated herein as the defendant, in the Circuit Court of Duval County. The declaration and bill of particulars are as follows:

"Blair Burwell, Jr., and Charles E. Hillyer, co-partners doing business as Burwell & Hillyer, by their attorneys, Kay, Doggett & Smith, sues Charlotte Harbor & Northern Railway company, a corporation organized and existing under the laws of the State of Florida, for that, on the 1st day of July, A. D. 1907, the defendant was indebted to the plaintiffs in the sum of two thousand dolars for money payable by the defendant to the plaintiffs for goods bargained and sold by the plaintiffs to the defendant.

2nd. And in the like sum for work done and materials provided by the plaintiffs for the defendant at its request.

3rd. And in the like sum for money lent by the plaintiffs to the defendant.

4th. And in the like sum for money paid by the plaintiffs for the defendant at its request.

5th. And in the like sum for money received by the defendant for the use of the plaintiffs.

6th. And in the like sum for money found to be due from the defendant to the plaintiffs on accounts stated between them.

7th. And in the like sum for interest on divers sums of money due to the plaintiffs by the defendant, foreborne to the defendant at its request by the plaintiffs before this time.

Wherefore, the plaintiffs bring this their suit, and asks damages in the sum of two thousand dollars.

And plaintiffs attach hereto a Bill of Particulars of the account sued on.

KAY, DOGGETT & SMITH,
*Attorneys for the Plaintiffs.*

"Jacksonville, Florida, June 10th, 1907.
The Charlotte Harbor and Northern Ry. Co.,
               To Burwell and Hillyer, *Dr.*

To 207 caps 12 in. by 12 in. by 12 ft.,
  29,808 ft. B. M., replaced at Gas-
  parilla. Sound where taken off by
  direction of Chief Engineer, act-
  ual amount paid by us to J. R.
  Chambliss for this work, at $7.00
  per M .......................                        $208 65
To 4 Gasparilla bridge seats, exact
  cost, to us over and above the
  $10.00 per M. B. M., allowed us in
  the estimate, ................ ........$133 00
To 272 drift bolts at 10 cts. each on
  the 4 Gasparilla bridge seats......    27 20
                                       ──────────
                                       . $160 20
To 10 per cent profit on the cost of
  these Gasparilla bridge seats, ....   16 02—  176 22
To 16 caps, 12 in. by 12 in. by 12 ft.,
  2,304 ft. B. M., replaced at Myakka
  River where taken off by direction
  of Chief Engineer, actual amount
  paid by us to J. R. Chambliss for
  this work, at $7.00 per M.,.......                   16 13
To 2 Myakka River Bridge seats, ex-
  act cost to us over and above the
  $10.50 per M. B. M. allowed us on
  the estimate, ...... .... ......    69 00
To 110 drift bolts at 10cts each on
  those 2 Myakka River bridge seats   11 00 .
                                     ──────────
                                     $ 80 00
To 10 per cent profit on cost of those
  Myakka River bridge seats......      8 00—  88 00

C. H. & N. R. R. Co. v. Burwell & Hillyer.—Opinion of Court.

To 4 1-2 tons of coal returned with
floating driver which you charged
to us at $4.75 per ton..........            21 37
                                           _____

                                           $510 37

Jacksonville, Florida, July 1st, 1907.

Charlotte Harbor & Northern Ry.

*To* Burwell & Hillyer, *Dr.*

Statement of bills sent to Charlotte Harbor & Northern Ry. which were passed by Mr. L. M. Fouts, 2nd Vice President and Gen. Mgr. C. H. & N. Ry., and sent to Auditor for payment:

May 1—1 bbl of cement taken from
     first shipment ..............$ 2 75
     1 bbl. of cement taken from
       Myakka by Mr. Spencer,
       resident engineer ........   2 75
     1 bbl. of cement left at Coral
       Creek for Va. B. & I. Co.
       on request of Mr. Bruce,
       through Mr. Spencer.....   2 75—  8 25

May 1—240 drift bolts, 660 lbs. at
     3 cents, ..........  ..........$19 80
     Labor, boring and drifting
       at Myakka Draw, 10 bents
       each side, ..............   2 00
     Cash to C. Lowe on request
       of Mr. Spencer, ..........   1 00
     14 hrs. towing raft from Cape
       Hays at 75c..............  10 50—  33 30

May 9—3143 lbs. cast washers at 3c... 94 29
827 lbs boat spikes at $3.40... 28 12
71 lbs cut washers at 4c.... 2 84
353 lbs. drift bolts at 3c...... 10 59
309 lbs machine bolts at 3c.. 9 27
311 lbs. lag screws, 248
screws, at 6.4c...... .... 15 87—160 98

$202 53

Jacksonville, Florida, July 1st, 1907.

The Charlotte Harbor & Northern Ry. Co.
*To* Burwell & Hillyer, *Dr.*

To 112 cubic yards crushed Granite at 2384 lbs. per cu. yard, which equals 133 1-2 tons at $2,716, ...... ...... ...... .... ......$362 58

The defendant pleaded "never indebted as alleged," and "never promised, as alleged," and an additional plea admitting indebtedness of $181.19 for the following claims named in the declaration, *viz*:
"1907—

May 9—3143 lbs. cast washers at 3c..$ 94 29
827 lbs. boat spikes at $3.40 28 12
71 lbs. cut washers, at 4c.. 2 84
353 lbs. drift bolts at 3c.. 10 59
309 lbs. machine bolts at 3c 9 27
311 lbs. lag· screws, 248
screws, at 6.4c, ........ 15 87

May 1—1 bbl. cement taken from
first shipment, ......... 2 75

| | | | |
|---|---|---|---|
| May 1—1 bbl. cement taken from Myakka by Mr. Spencer. | 2 75 | | |
| 1 bbl. cement left at Coral Creek for the V. B. & I. Co. on request of Mr. Bruce through Mr. Spencer, ........) .......... | 2 75 | | |
| 4 1-2 tons of coal returned at $4.75 per ton, ...... | 21 37 | | |
| | | $190 60 | |
| Less 200 drift bolts furnished by Connoly mail boat, 225 lbs, at 3c, April 10, 1907, ...... .... .... | 6 75 | | |
| For unloading rock returned from Myakka to Liverpool, ................ | 2 66— | | 9 41 |
| | | $181 19 | |

and setting up a tender and offer to pay that amount in settlement of said claims and demands, which amount was paid into the registry of the court.

On the trial the plaintiff recovered a verdict for the full amount claimed in the bill of particulars and a judgment was duly entered for that amount and interest, which judgment is here for review.

It appears that on April 4th, 1906, the plaintiffs entered into a contract, not under seal, with the defendant, then existing under another name containing, among others, the following clauses, under paragraph I:

"First: The contractors agree that they will construct, build, and in every respect complete the trestle bridging for a single track railroad, on the line of the Alifia, Manatee & Gulf Coast Railway Company, in

224    SUPREME COURT OF FLORIDA,

C. H. & N. R. R. Co. v. Burwell & Hillyer.—Opinion of Court.

Manatee and DeSoto Counties, State of Florida, from and including the Peace River Bridge near Fort Ogden and Myakka River bridge and the bridge across Gasparilla Sound to Gasparilla Island, and all intermediate openings of not less than fifty feet (50.)

"Second: The contractors hereby agree that they will, at their own expense, cost and charge, find and provide a full and ample supply of the best and most suitable tools and appliances required to be used in the performance of said work, and will furnish and provide in sufficient numbers all mechanics; laborers and other workmen, also all things that may be necessary and requisite for constructing and completing, within the time herein stipulated, the whole work herein agreed to be done.

Third: The work shall be done in strict conformity with such lines, levels, stakes, profiles, plans, maps, drawings, specifications and instructions as shall from time to time be given by the company's engineers as herein provided, for the guidance and direction of the contractors, provided the character or amount of the work is not changed.

Fourth: The work shall be commenced within ten days after the date of this agreement, and the aforesaid bridges across Peace River and Gasparilla Sound shall be completed on or before the first day of October, A. D. 1906, and the bridge across Myakka River and the intermediate bridges shall be completed on or before the first day of December, A. D. 1906."

The contract under paragraph 2 and first clause contains the prices to be paid by the defendant for pile driving and "for framing, working, bolting lumber in place complete as per plans and specifications, including all iron, viz: bolts, nuts, washers, spikes, nails, etc.,

necessary for the same, ten dollars and fifty cents ($10.50) per thousand B. M."

The the second cluse, paragraph 2, is as follows:

"Second: The said company is to furnish all piling, timber and other material necessary, except the iron above referred to, in raft or on lighters, or on shore at the work, provided, however, when delivering such piling and timber in rafts or on lighters, such delivery at the site along the line where the said bridges are being constructed, will be a fulfillment of the terms of this contract on the part of the company."

The fourth clause, paragraph 2, provides for monthly and final estimates to be paid on the certificate of the chief engineer.

The fifth clause, paragraph 2, provides that the chief engineer in making final estimates is not to be bound by previous monthly estimates.

The fifth clause of paragraph 3 provides that if work is required not contemplated, the chief engineer of the railroad company shall fix the price by which the parties are to abide.

The sixth clause of paragraph 3 provides that the company shall have the right to make alterations that may be deemed necessary in the location, line, grade, plan, form or dimensions of the work, then in writing, and how such work shall be paid for.

The seventh clause of paragraph 3 is as follows:

"Seventh: No claim for extra work shall under any circumstances be allowed or considered unless the same shall have been done in pursuance of an order in writing given by the engineer, but nothing shall be deemed or construed as extra work which can be measured and estimated under the terms of this contract."

Clause 8 under paragraph 3 provides that nothing herein shall be construed into a liability for damages;

that no charge or claim shall be made by the contractors for delay, and provides that the contractors shall have such extension of time for the completion of the work as shall be determined by the chief engineer to be equal to the delay caused by the omission of the company.

The twelfth and thirteenth clauses under paragraph three are as follows:

"Twelfth: All questions, differences or controversies which may arise between the company and the contractor, under or in reference to this arrangement and specification, or its performance or non-performance, or the work to which they relate, or in any way whatever pertaining to or connected with said work, shall be referred to the chief engineer of the company, and his decision shall be final and conclusive to both parties.

"Thirteenth: Whenever the word engineer or chief engineer is used herein, it shall be understood to refer to the chief engineer of the Alifia, Manatee & Gulf Coast Railway Company."

Whether the defendant was legally liable for any part of the amount claimed and recovered, except the item of $362.58 for crushed granite, and the items which are admitted to be due, depends upon whether or not the contract above referred to controls that liability. It is contended by the plaintiff in error that the amounts claimed as extra for bridge, seat work at Gasparilla Sound and Myakka river are not to be allowed because it was a part of the trestle and bridge work covered by the contract, and already paid for by the defendant, and also that if it is to be regarded as extra, or additional work, it was done without any written order by the chief engineer of the defendant as provided in the contract. The same contention is made by the defendant as to the items for capping, or recapping the piling, and the sundry items

for drift bolts used in that connection and the profits on the bridge seat work.

For the plaintiffs it is contended that under the course of dealing between the parties during the construction of the work provided for in the contract a strict adherence to provisions of the contract requiring that changes, alterations, extra and additional work, etc., should only fix liability on the railway company when ordered in writing by the chief engineer was not adhered to and that the defendant waived a strict observance of these provisions and so acted in the premises as to render itself liable for work and benefits actually received and not paid for. There does not seem to be any dispute that the defendant received the benefit of every one of the items charged in the bill of particulars except that for crushed granite, but denies that there has been any waiver by it of the strict requirements of the contract, and contends that except as to the admitted items, the plaintiff has been paid all that it is liable to pay under the contract. It is furthermore contended that there was no legal proof made of the reasonable value of the work, materials, etc., upon which the verdict was founded.

There does not seem to be any question about the validity of the provisions of the contract which have been heretofore set forth. Howard v. Pensacola & A. R. Co., 24 Fla. 560, text 606, 5 South. Rep. 356; Finegan & Co. v. L'Engle & Son, 8 Fla. 413, text 424. At the same time it seems to be well settled by high authority that such provisions may be waived by the parties. In the case of Bartlett v. Stanchfield, 148 Mass. 394, 19 N. E. Rep. 549, 2 L. R. A. 625, there was a provision in a building contract "that no charge shall be made for extra work or materials, unless the same is ordered in writing and the price thereof agreed upon," may be waived by the parties. In the opinion the court says: "The main

argument for the defendant is that, if the work fell within the provisions of the contract, there was no evidence of a waiver. We are of opinion that there was evidence for the jury. Attempts of parties to tie up by contract their freedom of dealing with each other are futile. The contract is a fact to be taken into account in interpreting the subsequent conduct of the plaintiff and defendant, no doubt. But it cannot be assumed, as a matter of law, that the contract governed all that was done until it was renounced in so many words, because the parties had a right to renounce it in any way, and by any mode of expression they saw fit. They could substitute a new oral contract by conduct and intimation, as well as by express words. In deciding whether they had waived the terms of the written contract, the jury had a right to assume that both parties remembered it, and knew its legal meaning. On that assumption, the question of waiver was a question as to what the plaintiff fairly might have understood to be the meaning of the defendant's conduct. If the plaintiff had a right to understand that the defendant expressed a consent to be liable, irrespective of written contract, and furnished the work and materials on that understanding, the defendant is bound." (Citing authorities.) See also to the same effect Copeland v. Hewett, 96 Me. 525, 53 Atl. Rep. 36; Bishop on Contracts (2nd Enlarged Ed.) sec. 767. In the case of McLeod v. Genius, 31 Neb. 1, 47 N. W. Rep. 473, the construction of a building contract was involved. It contained a provision that "no new work of any description done on the premises, nor work of any kind whatsoever shall be considered extras unless a separate estimate in writing for the same before it is commenced shall have been submitted by the contractor to the superintendent and proprietor and their signatures obtained thereto." It was held that such a provision may be

waived by the parties by parol, and it was further held that "the owner of a building is liable for work and materials furnished by the contractor in its construction, not called for by the original written contract where the owner or his authorized agent, by a subsequent oral agreement promised to pay therefor, or knew that the contractor would charge for the same as extras, and assented thereto, or permitted the same without objection." In Bishop on Contracts (2nd Enlarged Ed.) Section 792, a waiver is defined as follows: "Waiver is where one in possession of any right whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistently with the existence of the right, or of his intentions to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterwards." Again in section 804, it is said that "to a large extent, the binding effect of a waiver proceeds from the doctrine of estoppel, where no consideration is required." 29 Am. & Eng. Ency. Law (2nd Ed.) 1091 *et seq.* It is held by this court in Robinson v. Hyer, 35 Fla. 544, 17 South. Rep. 745, that a written contract not under seal may be waived or added to by subsequent oral agreement upon a sufficient consideration, as to its terms to be performed in the future, and that a consideration emanating from some injury or inconvenience to the one party, or from some benefit to the other is a recognized legal consideration.

We deem it pertinent to say that the evidence of Mr. George S. Bruce, the chief engineer of the defendant, shows that the defendant did not furnish the contractors with lumber and material as they were needed by the contractors, especially in June and July, 1906; that from a letter of his dated July 18, 1906, to the plaintiffs, he thought it not advisable to withdraw the bridge force

as he had advices from the mills that the lumber would be forthcoming; that the work was done under his direction and under that of the resident engineer *who represented him;* that he was ocasionally down when the work was being done; that he knew the work of slipping the caps was going on, and that it would cost as much to replace them as it would to place them at first; that he did agree to pay for anything they considered extra work outside the contract by the contract; that the lumber was not there for the caps and if the caps were not slipped the pile driver would have to stop work; that there was delay in getting timber for the work, which caused the slipping of the caps; that the contract did not provide for pulling and replacing the caps; that the bridge seat work was not included in the contract, was the last work done, and that Mr. Spencer, the resident engineer, was in charge of the completion of this work. It further appears from Mr. Bruce's testimony that several items of extra work, approved by the resident engineer and Mr. Bruce were paid by the railroad company, though this extra work had not been authorized in writing by the chief engineer as required by the contract. It also appears from the statements accompanying Mr. Fout's testimony that several of them were paid which were only approved by Spencer, the resident engineer.

Mr. Hillyer testified, among other things, in substance, that the items amounting to $33.30 were done by the direction of the resident engineer who told him the company would pay them; that when the trestle was practically completed Mr. Spencer, the resident engineer, directed the contractors to build the bridge seats, and that they were built under his direction, and he practically had charge of the men, and said he would allow pay for them; that they were not embraced in the contract; that Spencer agreed to allow 10c apiece for the

drift bolts used; that as to the recapping at Gasparilla
Sound the caps were taken off and put ahead by direc-·
tion of the chief engineer; that replacing them was not
required by the contract; that witness spoke to the chief
engineer about it, and he told witness at Hull he would
pay for that.    There was other testimony along this line,
but we have mentioned this as tending to show the course
of dealing between the parties, and as tending to show
that there was not a strict instance by the officers of the
company having supervision of the work upon a rigid
adherence to the terms and conditions of the contract.
And we do not think that the court erred in submitting
the case to the jury upon this theory.

We cannot find, however, in this record any clear proof
of the reasonable value of the work and materials used
by the contractors in the bridge seat work, or in the
recapping of the piles.    As to the work for recapping it
appears from Mr. Bruce's testimony that this involved
double work, and inferentially that it was rendered nec-
essary by the delay of the company in furnishing the
timber for capping while the piles were being driven. Mr.
Hillyer says that he paid the sub-contractor for this work
upon estimates furnished by the resident engineer.    But
he does not say that the resident engineer estimated the
reasonable value of the work, and it does not follow, if
he did so, that these estimates represented such reason-
able value.    The same thing is true of the bridge seat
work.    The plaintiffs, if they recovered at all, were only
entitled to recover for the reasonable value of the work
performed, and materials furnished, and as to this there
is no clear proof at all.

As to the item of $362.58 we are constrained to say,.
under our view of the law, there is no proof upon which
to charge the defendant.    The testimony of Mr. Bur-
well shows, in substance, that plaintiffs have some crushed

granite left from work done by them at Liverpool upon premises which seem to have been in the control of the defendant; that Mr. Burwell met Mr. L. M. Fouts, general manager of the defendant company at the Seminole Club in Jacksonville in January or February, 1907; that he offered this granite to Mr. Fouts for his company at less than cost, viz: $2.71 per ton; that Fouts said: "very well, in that case he would take the rock. Witness said to him (Fouts) that he would leave it there; that witness did not know how much he had, but Mr. Fouts' engineer could measure it and send witness a check for it. Mr. Fouts said all right." Subsequently, on June 10th, 1907, the plaintiffs sent a telegram to Geo. S. Bruce, chief engineer of the defendants company, in these words: "Wire quick about number tons rock Liverpool." Mr. Bruce turned over the telegram to Mr. E. E. Bradford, assistant engineer, who measured the rock and telegraphed the plaintiffs there were 112 cubic yards of rock at Liverpool. It does not appear that Mr. Bruce knew of what had taken place between Mr. Burwell and Mr. Fouts, but he says that he had the rock measured simply because he was requested so to do by the plaintiffs. It does not appear that subsequent to the conversation in the Seminole Club the defendant company ever touched the rock, or gave any orders in regard to it, or did anything whatever indicating a purpose to change the possession from the plaintiffs to the defendant. The rock simply remained where the plaintiffs had left it on the premises of the defendant. Mr. Fouts in his testimony distinctly repudiates any purchase by him of the rock in the conversation at the club or elsewhere. He admits having a conversation about the rock, but says that he told Mr. Burwell he did not know whether the defendant could use it, but if the defendant could, it would be glad to do so as an accommodation to Mr. Burwell, and that

he would request Mr. Bruce to measure it, but thinks he never did so; that he never took possession of the stone and has no knowledge of any delivery of the stone to the defendant. Nothing was ever paid for the rock, nothing given as earnest to bind the bargain, and no note or memorandum in writing was made of said bargain, signed by the parties or their agents.

Section 2518 General Statutes of 1906, is as follows: "No contract for the sale of any personal property, goods, wares, or merchandise shall be good, unless the buyer shall accept the goods (or part of them) so sold and actually received the same, or give something in earnest to bind the bargain, or in part payment, or some note or memorandum in writing of the said bargain or contract be made and signed by the parties to be charged by such contract, or their agents thereunto lawfully authorized."

Even upon the theory that the rock in this case was at the time of the proposed sale and thereafter in the possession of the defendant as bailee because it was on premises which the latter controlled, it is absolutely necessary under the circumstances to a consummated sale that the defendant should have done some act showing an acceptance by it of the rock.

In Benjamin on sales (5th Ed.) 215, where the question of acceptance is treated, the author quotes from Lillywhite v. Devereux, 15 M. & W. 285, as follows: "No doubt can be entertained after the case of Edan v. Dudfield, which was well decided by the Court of Queen's Bench that this is a question of fact for the jury; and that if it appears that the conduct of a defendant in dealing with goods already in his possession, is wholly inconsistent with the supposition that his former possession continues unchanged, he may properly be said to have accepted and actually received such goods under a contract so as to take the case out of the opera-

tion of the statutes of frauds; as for instance, if he sells or attempts to sell the goods, or if he disposes absolutely of the whole or any part of them or attempts to do so, or alters the nature of the property or the like. But we think such facts must be clearly shown." And the author says that in this case the court disagreed with the jury and set aside the verdict, as not justified by the evidence.

In the case of Dorsey v. Pike, 3 N. Y. Supp. 730, in discussing what constitutes an acceptance under the statute of frauds, where the property alleged to have been sold was in the possession of the defendant, the court says: "The mere fact that the property was in the possession of the defendant at the time of making the contract furnished no evidence of acceptance in its support (quoting authorities.) But there must be some act or conduct on the part of the buyer in respect to the property, which manifests an intention to accept it pursuant to, or in performance of the contract of sale and purchase which the parties have sought to make; and when the evidence is such as to warrant that conclusion, the question is usually one of fact for the jury."

In the case of Silkman Lumber Co. v. Hunholz, 132 Wis. 610, 112 N. W. Rep. 1081, it is held:

"Where the subject of a verbal sale agreement of personal property is in the possession of the contemplated vendee as bailee, or to some extent, by reason of its being on his premises by his permission, the mere agreement consisting of an offer to sell on specified terms and acceptance thereof does not work a change of possession, so as to satisfy the statute. To satisfy the statute of frauds in a situation such as last mentioned there must be some affirmative act on the part of the purchaser manifesting an intention to acept the property under the sale agreement, in order to make transition of title from seller to purchaser."

We are of opinion that applying these principles there is not sufficient proof in this record of an acceptance of the rock by the defendant so as to take the case out of the statute of frauds above cited. (Section 2518 General Statutes of 1906.)

There are a large number of assignments of error based on the admission in evidence of divers letters from the plaintiffs to the officers of defendant company setting up claims for remuneration for the work, labor, materials, etc., stated in the bill of particulars, and also to the admission of testimony on the part of witnesses of the plaintiffs upon the same matters. The objections are that such evidence was incompetent and irrelevant, and in some instances that it tended to vary the terms of the written contract. Upon the theory that parties to a written contract may subsequently to its execution by parol and the course of dealing between themselves waive the conditions and vigorous requirements of a written contract we cannot say that any of the testimony was entirely irrelevant or incompetent, as it all more or less tended to show the course of dealing between the parties. There are also a large number of assignments based on charges and instructions given by the court, and on instructions refused by the court on the theory that there could not be a waiver of the requirements of the written contract. We have not discovered any serious and reversible error under these assignments.

The only other assignment which we think it necessary to notice is based on the overruling of the motion in arrest of judgment. It seems to be insisted that the bill of particulars was made a part of the declaration, and stated no cause of action because in the bill of particulars certain amounts are stated as having been paid J. R. Chambliss a sub-contractor. The bill of particulars is

not made a part of the declaration, and the declaration itself is in the usual form. Shipman's Common Law Pleadings, p. 21. The bill of particulars contains no reference to a sub-contractor. We discover no ground for a motion in arrest of judgment.

There are sixty-four assignments of error presented here, and in addition question presented arising out of the overruling by the court of motions in arrest of judgment and for a new trial. We can not within any reasonable compass treat in detail these assignments, and have simply endeavored to discuss those which seemed to present the salient features of the case.

Because we do not think the item for crushed granite has been proven, and because there is no proper proof of the reasonable value of the other items mentioned, the judgment below is reversed and a new trial granted.

TAYLOR and PARKHILL, JJ., concur.

SHACKLEFORD, C. J., and COCKRELL and WHITFIELD, J.J., concur in the opinion.