**In re MARINELAND OCEAN RESORTS, INC., Debtor.**

**Bankruptcy No. 97–08346–3P1.**

United States Bankruptcy Court, M.D. Florida, Jacksonville Division.

Dec. 16, 1999.

John B. MacDonald, Jacksonville, FL, for Marineland Ocean Resorts, Inc.

Richard R. Thames, Jacksonville, FL, for Choice Hotel International, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Chief Judge.

This case came before the Court upon the objections of Marineland Ocean Resorts, Inc. ("Debtor") to Claims 62 and 116 filed by Choice Hotel International, Inc. ("Choice"), and upon Motion for Leave to File Amended Proof of Claim brought by Choice. The objections to claims and motion for leave were consolidated and heard at trial on August 26, 1999. Upon the evidence presented, the Court makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

1. Marineland, Inc. is the former owner and operator of the Marineland oceanfront theme park and resort in Flagler County, Florida. The facilities included a marine animal attraction, a restaurant, a campground, a marina and two hotels located at 9507 Ocean Shore Boulevard, Marineland, Florida (the "Property"). (Aug. 26, 1999 Tr. at 11–12.)

2. During 1995 and continuing through April, 1996, Debtor negotiated with Marineland, Inc. for the purchase of the Property. Debtor ultimately closed on the Property on or about April 15, 1996. (*Id.* at 11–13.) At the time of the closing, the hotels on the Property were operating subject to a Quality Inn Franchise Agreement dated May 20, 1974, between Marineland,

Inc. and Quality Inns International, Inc.[1] (the "Franchise Agreement".) (*Id.* at 14; Choice Ex. 2.)

3. In connection with the closing, Debtor and Marineland, Inc. entered into an Assignment and Undertaking Agreement dated March, 1, 1996, with its effective date being the date of closing of April 15, 1996 (the "Agreement"). (Aug. 26, 1999 Tr. at 15; Debtor Ex. 1.) The Agreement provided that Debtor would assume and indemnify on behalf of Marineland, Inc. the various contracts listed on Schedule 1.05, including the Franchise Agreement. (Debtor Ex. 1 at Schedule 1.05.)

4. Debtor began operating the hotels on or about April 10, 1996. (Aug. 26, 1999 Tr. at 46–53.) Based upon the review of the Property's records and the actual benefits derived from the licenses with Choice, Debtor determined not to continue with the franchise relationship with Choice. (*Id.* at 28.) By letter dated May 3, 1996, the president of Debtor, Jack Coovert, gave notice to Choice of Debtor's intent to "cancel our franchise agreement with Choice Hotels International effective May 31, 1996 or as soon as possible." (Choice Ex. 14.)

5. The Franchise Agreement between Debtor and Choice permitted the licensee to terminate the Franchise Agreement (after 20 years) on any anniversary of the commencement date, provided it gave Choice no less than three months written notice of its intent to terminate. (Choice Ex. 2.) Although Debtor had missed the deadline for notifying Choice of its desire to terminate the Franchise Agreement on the 1996 anniversary date, Choice honored the request and, by letter dated May 16, 1996, permitted Debtor to terminate the Franchise Agreement effective August 1, 1996. (Choice Ex. 15.) However, by letter dated May 24, 1996, Choice advised Marineland, Inc. that it remained liable on

the Franchise Agreement and that as a result of the sale of the Property to Debtor, Marineland, Inc. was in default.[2] (Debtor Ex. 16.) On May 24, 1996, Choice sent a re-licensing package to Debtor for its consideration. (Choice Ex. 16.)

6. Sometime after May 31, 1996, on its own initiative, Debtor began to take steps to de-identify the Property as a Choice franchise. (Aug. 26, 1999 Tr. at 30.) The de-identification included the substitution of all brochures and advertisements designating the hotels as being affiliated with Choice. (Debtor Exs. 9, 10.) Furthermore, no paraphernalia such as towels, soap, and other room accouterments with Choice's logo were displayed at the hotels. (Aug. 26, 1999 Tr. at 32–33.) However, Debtor admitted that the hotels continued to use after-market receipts with the Choice logo and that exterior signage on the roadway and over the hotel office door continued to display the Choice designation of "Quality Inn". (*Id.* at 46–47; Choice Exs. 13, 20.)

7. On October 30, 1997, Debtor filed a Chapter 11 petition with this Court. (Doc. 1.) An order establishing a claims bar date of July 22, 1998 was entered on April 23, 1998. (Doc. 114.)

8. Choice filed its original proof of claim (Claim 62) on May 19, 1998. (Choice Ex. 23.) Claim 62 sought to recover $27,-560.98 in unpaid pre-petition royalties and other sums due under the Franchise Agreement through the August 1, 1996 termination date. (*Id.*) Debtor's plan of reorganization was confirmed on July 8, 1998. (Doc. 215.)

9. Debtor timely filed an objection to Claim 62 on August 21, 1998. The objection was later amended solely to delete the Unsecured Creditors' Committee as a movant thereunder. (Doc. 309.) On June 15, 1999, Choice filed Claim 116 in the

---

**1.** Choice is the successor to Quality Inns International, Inc. and the owner of the Quality Inns Trade names and service marks. (August 16, 1999 Tr. at 106.) References to "Choice" include reference to Quality Inns International, Inc.

**2.** *See infra* note 5, and accompanying text.

amount of $119, 372.40. (Choice Ex. 24.) Claim 116 includes damages for the alleged unauthorized use of Choice trademarks through March 1, 1997. Claim 116 also seeks, in the alternative, quantum meruit damages of $148,139, which allegedly represents the value of the reservations placed through Choice's reservation system for the period of May 1, 1996 through July 31, 1996. Debtor filed an objection to Claim 116 on June 16, 1999, upon which Choice filed a response. (Docs. 512, 514.) Thereafter, on June 22, 1999, Choice filed Motion for Leave to File Amended Proof of Claim. (Doc. 515.)

### CONCLUSIONS OF LAW

Choice contends that Debtor expressly assumed the Franchise Agreement, therefore, Debtor is responsible for royalty charges and other fees related to the continued operation of the Property under the trade name Quality Inn for the several months following the assignment. (Choice Post-trial Mem. at 9–12.) Additionally, Choice argues that even in the absence of an express assumption of the contract, it is entitled to quantum meruit recovery because Debtor knowingly accepted the benefits of the Franchise Agreement. (Id. at 12–17.) Moreover, Choice contends that Claim 116 arises out of the same transactions as Claim 62, therefore, it is properly allowable as an amended claim. (Id. at 21–28.) Choice therefore alleges that it is entitled to liquidated damages based on Debtor's unauthorized use of Choice marks through June 16, 1997. (Id. at 18–21.)

Debtor objects to the merits of Claims 62 and 116 based on, among other things, that it did not assume the Franchise agreement. (Debtor Mem. at 16–24.) Moreover, Debtor contends that Claim 116 is not an amendment to Claim 62, therefore, it is time barred. (Id. at 7–13.) Alternatively, Debtor argues that even if Claim 116 amends Claim 62, equitable factors bar the amendment. (Id. at 13–16.) The Court will first decide whether Claim 116 amends Claim 62 or whether it asserts a new claim.

### I. Amendment or Assertion of New Claim?

As this Court has previously noted, "[t]he bar date for filing proofs of claim in Chapter 11 cases is a mechanism intended by Congress to provide the debtor and its creditors with 'finality.'" *Norris Grain Co. v. United States (In re Norris Grain Co.)*, 81 B.R. 103, 105 (Bankr.M.D.Fla. 1987), *aff'd*, 131 B.R. 747 (M.D.Fla.1990), *aff'd*, 969 F.2d 1047 (11th Cir.1992) (citations omitted). *See Hoos & Co. v. Dynamics Corp. of Am.*, 570 F.2d 433, 439 (2d Cir.1978) (noting Congress decided goal of finality is of greater benefit to public than benefit derived from allowing individual exceptions to bar date). Post-bar date claims disrupt the orderly discharge of a debtor and, for this reason, late-filed claims are generally disallowed. *See Biscayne 21 Condominium Ass'n. Inc. v. South Atl. Fin. Corp. (In re South Atl. Fin. Corp.)*, 767 F.2d 814, 817–18 (11th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1197, 89 L.Ed.2d 311 (1986); *see also Security Sav. and Loan Ass'n of Dickinson, Tex. v. Kay Homes, Inc. (In re Kay Homes, Inc.)*, 57 B.R. 967, 971 (Bankr. S.D.Tex.1986) (viewing claims bar date in nature of statute of limitations; to be strictly observed). Accordingly, the Eleventh Circuit has mandated that courts carefully scrutinize post-bar date amendments to ensure that the amendment is genuine rather than an assertion of an entirely new claim. *See United States v. Int'l Horizons, Inc. (In re Int'l Horizons, Inc.)*, 751 F.2d 1213, 1216 (11th Cir.1985) (citing *First Nat'l Bank of Mobile v. Everhart (In re Commonwealth Corp.)*, 617 F.2d 415, 420 (5th Cir.1980)).

#### A. Traditional Analysis

Nevertheless, courts liberally allow claim amendments when the purpose is to cure a defect in the claim as originally filed, to describe the claim with greater

particularity or to plead a new theory of recovery on the facts set forth in the original claim. *See Int'l Horizons, Inc.,* 751 F.2d at 1216 (citations omitted). *See also Norris Grain,* 81 B.R. at 106 (noting amendment traditionally permitted if it arises out of same transaction or occurrence underlying original timely filed claim). Similarly, amendment is freely permitted so long as the initial claim provides adequate notice of the existence and nature of the claim, as well as the creditor's intent to hold the estate liable. *See Unioil v. H.E. Elledge (In re Unioil, Inc.),* 962 F.2d 988, 992 (10th Cir.1992). Likewise, to be within the scope of a permissible amendment, the amended claim should not only be of the same nature as the original, but also reasonably within the amount to which the original claim provided notice. *See In re AM Int'l, Inc.,* 67 B.R. 79, 82 (N.D.Ill.1986) (citing *Int'l Horizons, Inc.,* 751 F.2d at 1216). However, if the initial proof of claim does not "give fair notice of the conduct, transaction or occurrence that forms the basis of the claim asserted in the amendment", then the amendment asserts a new claim and will not be allowed. *Pepperland, Inc. v. Westgate–Cal. Corp. (In re Westgate–Cal. Corp.),* 621 F.2d 983, 984 (9th Cir.1980).

The Court initially notes that Choice does not assert that Claim 116 cures any defect in Claim 62, therefore, the Court will determine whether Claim 116 describes Claim 62 with greater particularity or pleads a new theory of recovery on the facts set forth in the original claim. Claim 62 asserts an unsecured, non-priority claim in the amount of $27,560.98 arising from charges calculated under the Franchise Agreement and other contracts for services allegedly provided by Choice through July 31, 1996. (Choice Ex. 23.) Claim 116 includes the original charges of $27,560.98, but adds separate and distinct claims for: (1) royalties for June, 1996; (2) royalties for July, 1996; (3) liquidated damages as calculated under the Franchise Agreement for alleged unauthorized use of Choice marks; (4) treble damages for unautho-

rized use of Choice marks under the Franchise Agreement; and (5) a footnote in which Choice alleges that it has a right to quantum meruit damages for reservations placed through its system from March through August, 1996, in the amount of $148,139.00, plus actual and treble damages in an unknown amount for the unauthorized use of Choice marks. (Choice Ex. 24.)

■ It is without dispute that the proposed amendment arose from the identical transaction as the original claim: the Franchise Agreement. However, the royalties for June and July, 1996, are already included in the total of $27,560.98 as compiled in Claim 62 and thus, simply compound the elements of Choice's claim as originally filed. Further, the liquidated and treble damages alleged in Claim 116 are not based upon the same facts asserted in Claim 62, which is based solely on monthly fees and associated charges under the Franchise Agreement. The liquidated and treble damages are independent claims based upon an alleged extended and unauthorized use of Choice marks; not on the standardized monthly royalty fees and associated charges set forth in Claim 62. Thus, the facts allegedly demonstrating the extended and unauthorized use of Choice marks did not form the basis for Claim 62. Likewise, Choice's claim of quantum meruit in footnote 1 of Claim 116 is not based upon the standardized monthly royalty fees found in Claim 62, but instead is based solely on additional facts allegedly demonstrating actual benefits derived by Debtor from services provided by Choice. Moreover, Claim 62 only gave fair notice of the standardized monthly fees and associated charges under the Franchise Agreement in the amount of $27,560.98. The transactions which gave rise to Claim 62 did not give fair notice of a claim for quantum meruit, or treble and liquidated damages associated with the unauthorized use of Choice marks in an amount potentially exceeding $119,000. *See AM Int'l, Inc.,* 67 B.R. at 82; *Pepper-*

*land, Inc.*, 621 F.2d at 984. The new theories of recovery asserted by Choice in Claim 116 are simply not based upon the same set of facts as set forth in the original claim. Therefore, the Court finds that such an amendment is in fact an assertion of a new claim. *See In re Nat'l Merchandise, Co., Inc.*, 206 B.R. 993, 1000 (Bankr. M.D.Fla.1997) (amendment seeking to change status of claim from unsecured to secured is assertion of new claim); *see also In re Jones*, 219 B.R. 631, 634 (Bankr. M.D.Fla.1998) (amendment seeking to change status of claim from priority to unsecured is assertion of new claim; although both claims arose from identical occurrence).

**B. Equitable Considerations**

■ Notwithstanding the fact that the claims are distinct, Claim 116 may be allowed as an amendment based on the equitable balancing test as enumerated in *In re Miss Glamour Coat Co., Inc.*, 79 Civ. 2605, 1980 WL 1668, at *5 (S.D.N.Y. Oct. 8, 1980). The *Miss Glamour Coat* factors have traditionally been construed as focusing on bad faith, prejudice and delay, and involve a consideration of the following:

(1) whether the debtor and creditors relied upon the earlier proof of claim or had reason to know that a subsequent proof of claim would be filed;

(2) whether other creditors would receive a windfall if the court refused to allow amendment;

(3) whether claimant intentionally or negligently delayed in filing the amendment;

(4) the justification for the failure to file for an extension to the bar date;

(5) whether other equitable considerations exist which compel amendment.

*See Int'l Horizons, Inc.*, 751 F.2d at 1218–19; *Jones*, 219 B.R. at 634.

■ With regard to the first factor, the Court finds that the original claim in the amount of $27,560.98 did not provide notice to the Court or any interested party that a subsequent claim for treble damages, liquidated damages or quantum meruit for an amount, at minimum, of $119,000 would be forthcoming. Moreover, fifty-one of Debtor's creditors whom filed claims settled them in reliance on Debtor's maximum exposure to Choice being no more than $27,560.98. To allow Claim 116 in an amount of no less than $119,000 would potentially dilute the distribution to these creditors, whom may not have settled their claims had they known their distribution may be diluted by a claim potentially exceeding five-times Choice's original timely filed claim. Therefore, the equities favor Debtor and the creditors whom had no notice of the second claim and relied on its absence.

The second factor announced in *Miss Glamour Coat* addresses whether the other creditors would receive a windfall were the Court to disallow the amendment.[3] Since all other creditors expected Debtor's maximum liability to Choice to be $27,560.98 pursuant to Claim 62, disallowing the amendment would put them in the position they anticipated when they settled their claims. To the contrary, allowing the amendment would potentially dilute all other creditors' claims. Therefore, the Court finds that the creditors would not receive a windfall if the amendment is disallowed.

The third and fourth *Miss Glamour Coat* factors address whether or not the creditor was at fault in failing to timely file the claim. *See Norris Grain*, 81 B.R. at

---

**3.** Neither Debtor nor Choice addresses this factor in their post-trial briefs. Choice notes that the Court has previously found this factor inappropriate in deciding whether to permit a post-bar date amendment to a claim. (Choice Post-trial Mem. at 25) (citing *Norris Grain*, 81 B.R. at 108; *In re Haack*, 165 B.R. 501, 504

(Bankr.M.D.Fla.1994)). However, the Court has subsequently considered this factor in allowing a post-bar date amendment. *See Jones*, 219 B.R. at 635 (finding creditors would receive windfall were Court to disallow amendment).

108. Choice points out that it requested leave to amend Claim 62 in its initial response filed shortly after the bar date. (Choice Post-trial Mem. at 26.) Also, Choice contends that any delay in filing Claim 116 was caused by Debtor's failure to produce requested documents, not by the neglect or intentional design of Choice. (*Id.* at 25–27.) However, although Choice asserts that it did not learn of Debtor's position with regard to the Franchise Agreement until after the bar date, such information was discernible from Debtor's objection to Claim 62 filed on August 16, 1996. Nonetheless, Choice waited some ten months after Debtor's objection before filing Claim 116. Furthermore, Choice did not file a motion to extend the time for filing claims which could have been done prior to the bar date in order to give it time to wait for the requested information.

In its Motion for Leave to File Amended Claim, Choice contends that it could not amend its claim until after the bar date because it did not learn of the unauthorized use of Choice marks until June 17, 1999. However, Claim 116 was filed on June 15, 1999, thus, the information obtained on June 17 could not have been included in the claim. Furthermore, Choice was apprised of information regarding the alleged unauthorized use of Choice marks some four months earlier through the deposition testimony of Jack Coovert, former president of Debtor, in which he stated that he believed the Choice signage was not removed until March of 1997. (Choice Ex. 8 at p. 14.) Therefore, Choice's arguments for allowing it to amend its claim are untenable. Clearly, Choice was at fault for not timely filing its claim.

 The final element of the equitable balancing test requires the Court to consider any other equitable factors in order to assure a just and equitable result. *See Miss Glamour Coat,* 1980 WL 1668, *5. Choice argues that it would be inequitable to allow Debtor to retain the benefits of Choice's trademarks and signage without adequately compensating Choice for their use. (Choice Post-trial Memo. at 28–29.) However, Choice's argument is unappealing. A much greater inequity would result if the Court were to allow Claim 116. Claim 116 was filed approximately 13 months after Choice's original claim and some 10 months after Debtor's initial objection to Claim 62. Moreover, Claim 62 did not give Debtor notice of the nature or amount of Claim 116, both of which have changed considerably. Based on the foregoing analysis, the Court concludes that the equities weigh in favor of disallowing the amendment. Accordingly, the Court will sustain Debtor's objection to Claim 116 and deny Choice's Motion for Leave to File Amended Proof of Claim.[4] The Court

---

4. Debtor argues that Choice's failure to timely file Claim 116 was not the result of "excusable neglect". (Debtor Mem. at 11–12.) However, Choice does not specifically address "excusable neglect" in its brief or Motion for Leave to File Amended Proof of Claim, although its arguments for allowing the amended claim are similar to those involved in an "excusable neglect" situation. (*See generally* Choice Post-trial Mem.; Doc. 515.) Choice's arguments for allowing Claim 116 rely on it being construed as an "amendment" to Claim 62, which was timely filed. (*Id.*) A post-bar date claim relates back to the original claim and is deemed timely filed if allowed as an amendment in accordance with the traditional or equitable analysis as set forth by the Eleventh Circuit. *See* discussion *supra* Part I.A–B. On the other hand, a "new" post-bar date claim will only be allowed if the claimant can demonstrate that its failure to file in a timely manner was the result of "excusable neglect". *See South Atl. Fin. Corp.,* 767 F.2d at 817–20; *see also* FED. R. BANKR. P. 3003(C)(3), 9006(b)(1). In this case, Choice seeks to file an amended claim, not an untimely claim. Nevertheless, even if the Court construes Choice's Motion For Leave to File Amended Proof of Claim as a request to file an untimely proof of claim, Choice failed to offer any legitimate reason beyond its reasonable control to justify its failure to comply with the bar date. *See* discussion *supra* Part I.B. *See also South Atl. Fin. Corp.,* 767 F.2d at 818–20 (finding no "excusable neglect" when failure to file timely claim was not the result of circumstances beyond creditor's reasonable control). Accordingly, the Court holds that Choice's failure to comply with the

turns then to Debtor's objection to Claim 62.

## II. Merits of Claim 62

 A proper proof of claim is presumed valid, and is prima facie evidence of the validity of both the claim and its amount. *See In re St. Augustine Gun Works,* 75 B.R. 495 (Bankr.M.D.Fla.1987). Consequently, the objecting party has the burden of coming forward with sufficient evidence to rebut the prima facie validity of the claim. *See In re Haack,* 165 B.R. 501, 503 (Bankr.M.D.Fla.1994) (citing *St. Augustine Gun Works,* 75 B.R. at 496). Once the objecting party meets this burden, the claimant has the ultimate burden of proving the validity and amount of the claim. *Id.*

 Choice contends that the sums asserted in Claim 62 are due and owing because Debtor expressly assumed the Franchise Agreement. (Choice Post-trial Mem. at 7.) Moreover, Choice argues that Debtor knowingly accepted the benefits of the Franchise Agreement, therefore, it cannot credibly argue that it has no financial obligation to Choice. (*Id.* at 12.) Conversely, Debtor argues that it has no obligation to Choice because there was no novation[5] between the parties, and Choice did not expressly approve, in writing, of the assignment of the Franchise Agreement from Marineland, Inc. to Debtor. (Debtor Mem. at 16–21.) In addition,

Debtor contends that it did not derive any benefit from the Franchise Agreement, therefore, it does not owe Choice for the services assessed under the Re-licensing Guidelines. (*Id.* at 21–23.)

 Initially, Choice and Debtor dispute whether or not Choice had to provide express written approval of an assignment of the Franchise Agreement from Marineland, Inc. to Debtor. After a thorough reading of the Franchise Agreement, the Court concludes that Marineland, Inc. could not assign the agreement without the prior written consent of Choice. (*See* Choice Ex. 2, ¶ 12.) However, the Court also recognizes that such a provision may be waived. *See Charlotte Harbor & N. Ry. Co. v. Burwell,* 56 Fla. 217, 48 So. 213 (1908). The doctrine of waiver holds that a party may waive a covenant of a contract for whose benefit it is inserted. *See Gilman v. Butzloff,* 155 Fla. 888, 22 So.2d 263 (1945). The Court concludes that the covenant not to assign without the prior written consent of Choice was inserted into the Franchise Agreement for the benefit of Choice. Therefore, pursuant to the doctrine of waiver, Choice may waive the written consent requirement in the Franchise Agreement. *See American Ideal Management, Inc. v. Dale Village Inc.,* 567 So.2d 497, 501 (Fla.Dist.Ct.App.1990). The acts and conduct of a party to a contract, with knowledge of the fact that the contract has been assigned, may warrant the conclusion

bar date was not the result of "excusable neglect" and therefore, Claim 116 is disallowed as a late filed claim.

5. The Court does not find it necessary to determine whether or not a novation has occurred. Debtor mistakenly contends that a novation is necessary in order for it to be an obligor under the Franchise Agreement. However, the General Assignment of Contracts and Assumption of Liabilities is an assignment of the rights and a delegation of performance of the duties of the assignor, and its acceptance by the assignee constitutes a promise by him or her to perform those duties. (*See* Choice Ex. 1.) This promise is enforceable by either the assignor or the other party to the original contract. On the other

hand, "[a] novation is a mutual agreement between the parties concerned for the discharge of a valid existing obligation by the substitution of a valid new contract ...." *Miami Nat'l Bank v. Forecast Constr. Corp.,* 366 So.2d 1202, 1204 (Fla.App.3d DCA 1979). A novation is only necessary to completely release the original contracting party from its obligations under the Franchise Agreement. *See Estate of Johnston v. TPE Hotels, Inc.,* 719 So.2d 22, 25 (Fla.App.5th DCA 1998), *reh'g denied,* (1998) *review denied,* 727 So.2d 904 (Fla.1999). Because the issue of whether Marineland, Inc. continues to remain liable to Choice on the Franchise Agreement is not before the Court, the Court need not address whether or not a novation has occurred.

that a provision requiring written consent to an assignment has been waived. *See Orlando Orange Groves Co. v. Hale,* 119 Fla. 159, 174, 161 So. 284 (1935); *see also Holman v. Halford,* 518 So.2d 442, 443 (Fla.Dist.Ct.App.1988) (noting lessor may waive provision requiring written consent to subletting either by accepting benefits of sublease or through subsequent course of conduct).

■ Paragraph 13(a) of the Franchise Agreement states that the franchised motel will not be sold or assigned unless the buyer or transferee "shall, in writing, accept title thereto subject to all the conditions and covenants hereof for and during the unexpired term hereof, as fully and with the same effect as though said buyer, assignee or transferee were an original party and signatory hereto." (Choice Ex. 2, ¶ 13(a).) In this case, Debtor expressly agreed to "perform and carry out all of the terms, covenants and conditions" of the Franchise Agreement pursuant to the terms of the Assignment and Undertaking Agreement dated March 1, 1996.[6] (Choice Ex. 1.) Therefore, notwithstanding the prior written consent provision, the conditions for assignment pursuant to paragraph 13(a) of the Franchise Agreement were met. The assignment, however, was subject to Choice's right to reject the assignment or transferee within 60 days after notification of the transfer. (*See* Choice Ex. 2, ¶ 13(d).) Notice of the assignment was given to Choice by at least May 3, 1996, giving Choice until July 3, 1996, to reject the assignment and terminate the Franchise Agreement. (*See* Choice Exs. 14, 17.) Choice did not elect to do so. Instead, Choice continued to do business with Debtor pursuant to the Franchise Agreement. Moreover, Choice subsequently honored Debtor's request to terminate the Franchise Agreement effective August 1, 1996. (Choice Ex. 15.)

The Court finds that the evidence shows that Choice accepted Debtor as the entity with whom it would deal under the Franchise Agreement and, through the subsequent course of dealing between the parties, established a waiver of the provision that requires prior written consent to an assignment. *See Vitra–Spray of Fla., Inc. v. Gumenick,* 144 So.2d 533 (Fla.Dist.Ct. App.1962). Based on the foregoing, the actions of Choice and Debtor point inescapably to the conclusion that the Franchise Agreement and related documents were validly assigned from Marineland, Inc. to Debtor. *See Orlando Orange Groves Co.,* 119 Fla. at 174, 161 So. 284.

■ Debtor continued to operate the Property using Choice's trade names, trademarks and system and, for a period of at least two months thereafter, continued to submit monthly sales reports to Choice. Choice's account statement reflects the sums due for the period of May, 1996, through July 31, 1996, plus service and guest refund charges which accrued after the August 1, 1996 termination date. (*See* Choice Ex. 7.) It does not include post-termination damage claims relating to the unauthorized use of Choice's marks after the termination date. Thus, all of the charges reflected on the account statement were properly assessed in accordance with the contractual relationships between the parties. (*See* Choice Exs. 2– 7, 12.) The Court finds Debtor's remaining arguments regarding a lack of any benefit derived from the Franchise Agreement similarly unappealing. Thus, Debtor has failed to come forth with sufficient evidence to rebut the prima facie validity of Claim 62. Hence, as a result of Debtor's continued operation of the Property pursuant to the Franchise Agreement and related documents, Debtor is bound to pay Choice the sums at issue in Claim 62.

### CONCLUSION

Based on the foregoing, Debtor's objection to Claim 116 is sustained and Choice's Motion for Leave to File Amended Claim is denied. Moreover, upon the evidence

---

6. *See supra* note 5, and accompanying text.

presented, Debtor's objection to Claim 62 is overruled, and the claim is allowed as filed as a general unsecured claim in the amount of $27,560.98. A separate order will be entered in accordance with these Findings of Fact and Conclusions of Law.