In the

# United States Court of Appeals
### For the Seventh Circuit
_____

Nos. 07-1726, 07-1727

ERAGEN BIOSCIENCES, INC.,

*Plaintiff-Appellee, Cross-Appellant,*

*v.*

NUCLEIC ACIDS LICENSING LLC,

*Defendant-Appellant, Cross-Appellee,*

and

STEVEN A. BENNER,

*Defendant, Cross-Appellee.*

_____

Appeals from the United States District Court
for the Western District of Wisconsin.
No. 06-C-305-C—**Barbara B. Crabb**, *Chief Judge.*

_____

ARGUED JUNE 2, 2008—DECIDED SEPTEMBER 2, 2008

_____

Before EASTERBROOK, *Chief Judge*, and ROVNER and
WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* Litigation can sometimes take on
a life of its own, propelling the parties into maneuvers

and rhetorical flourishes that might not have been undertaken in more placid times. This case seems to be a cautionary tale for how the pressures of litigation can overtake parties like Hokusai's wave swamping the boats ("The Great Wave Off Kanagawa," ca. 1831, Katsushika Hokusai (1760-1849)).

Dr. Steven Benner invented and patented some useful techniques for using DNA in laboratory environments. He formed Sulfonics, Inc., which in 1999 was merged into EraGen. As part of this acquisition, EraGen signed several licensing agreements with Benner allowing it to use his patents. For a time Benner sat on EraGen's board of directors. Things were not as good as they seemed, however. From the beginning, EraGen and Benner did not trust each other, and they had constant disputes over matters including the timeliness of royalty payments, sublicensing agreements EraGen had made with Bayer, whether EraGen's management should be replaced, and whether Benner had succeeded in his effort to terminate the agreements in 2004. The parties concluded new agreements on April 27, 2005, in an attempt to set aside their earlier problems. Of the several agreements, the most important for this litigation is the Artificially Enhanced Genetic Information System (AEGIS) Agreement ("the Agreement"). The Agreement provided for a semiannual payment of royalties on March 1 (covering July to December of the previous calendar year) and September 1 (covering January through June of that calendar year).

The wheels fell off the wagon with the very first royalty payment under the new Agreement on September 1, 2005:

Benner thought that he was underpaid, but EraGen thought that it had overpaid him. Benner then tried to exercise his right to terminate, but EraGen disputed (again) whether that termination was effective. To complicate matters, Benner had assigned all of his rights under the Agreement to Nucleic Acids Licensing ("NAL"), as of August 11, but he did not inform EraGen that he had done so until October 21. (From this point onward, unless the context requires otherwise, we refer to Benner and NAL interchangeably.) To make matters even more confused, there appears to have been a Bayer sublicense for cystic fibrosis research that may or may not have been concealed from NAL because it may or may not have been related to the AEGIS patents—but which the district court did not examine in any case. (In order to distinguish it from an existing Bayer sublicense, we refer to the "missing" license as the "cystic fibrosis sublicense" throughout this opinion.) Letters, then threats, then summonses were exchanged, and the case ended up in federal court.

On cross-motions for summary judgment, the district court split the difference. It found that EraGen did breach the Agreement by underpaying Benner, but it also found that Benner had waived the breach through his conduct in the months that followed. Both parties asserted claims for money had and received (unjust enrichment), but the district court granted summary judgment against both on that issue. The district court likewise granted summary judgment against both parties on claims of a breach of good faith and fair dealing. No one has appealed from the latter ruling. The rest is left for us to sort out on *de novo* review. See *Harrell v. United States Postal*

*Service*, 445 F.3d 913, 918 (7th Cir. 2006). We do so under the substantive law of Florida, which (all agree) is the jurisdiction to which Wisconsin's choice-of-law principles direct us.

## I

Before reaching the central question—was the Agreement properly terminated—we must decide whether this is still a live issue. In other words, even if Benner took the right steps to terminate the Agreement, did he then waive the benefits of that termination and allow the Agreement to continue uninterrupted? This, roughly, is how the district court interpreted the sequence of events. It concluded that NAL and Benner had (after several detours) terminated the Agreement effective November 2, 2005, but that they reopened the discussions about royalties in February 2006 and continued them through May without reasserting that the Agreement had been terminated. Even more persuasive to the district court was the fact that NAL accepted and deposited the March 1, 2006, royalty payment without challenge, even though the Agreement had long since, by NAL's lights, supposedly been terminated. NAL also sent a letter in March indicating that "this matter can be resolved," which seemed to the district court inconsistent with termination. For these reasons, the district court found that NAL continued to act as if the Agreement were still in force after declaring it terminated, and thereby somehow nullified the termination and forgave the breach. See *Acosta v. Dist. Bd. of Trustees of Miami-Dade Community College*, 905 So. 2d 226, 229 (Fla. Dist. Ct. App. 2003).

There is another way to look at NAL's actions, however: after declaring that the Agreement had been breached and exercising its right to terminate, NAL could simply have been mitigating its damages. The Agreement specifically provided that all rights under the licenses would revert to Benner (or NAL, after assignment) upon termination. Agreement §§ 2.3, 4.2. Upon proper termination of the Agreement, EraGen would have no right to retain the royalties, because it no longer held the licenses or benefitted from the sublicenses. Thus, NAL's acceptance of royalty payments from EraGen would merely mitigate the damages arising from the breach precipitating the termination: that money would arguably belong to NAL if it sued for unjust enrichment on a properly terminated contract. Florida applies the ordinary principles of mitigation of damages to contract law, *Young v. Cobbs*, 110 So. 2d 651, 653 (Fla. 1959), and so shall we: if a party is mitigating damages, it is not, in so doing, waiving the breach that caused the damages.

The facts offer more support for the mitigation hypothesis than they do the waiver interpretation. In its letter of March 4, 2006, acknowledging receipt of the checks, NAL expressly reiterated its position that the AEGIS Agreement had been terminated in November. The Agreement itself says that termination "shall not release either party from any obligation heretofore accrued." Agreement § 4.4. The March 2006 payment was for royalties accrued from July through December of 2005, most of which predated the November 2005 termination. Given the wording of this letter and the accrued obligation, acceptance of the payment is better seen as mitigation of damages rather than waiver of any claim.

Another reason to reject the waiver interpretation is that it creates a logical problem: if a contract has been terminated, rightly or wrongly, is it possible any more to "waive" anything about it? While one can waive a *breach* and proceed as if the contract were still in force, termination is a different story: "When a contract is terminated, even wrongfully, there is no longer a contract*." Horwitz-Matthews, Inc. v. Chicago*, 78 F.3d 1248, 1251 (7th Cir. 1996) (Illinois law); see also *Indian River Colony Club, Inc. v. Schopke Constr. & Eng'g, Inc.,* 592 So.2d 1185 (Fla. Dist. Ct. App. 1992). If the contract was properly terminated, there is nothing left to waive (other than, perhaps, continued benefits under the contract, although one could also mitigate damages by accepting such benefits). If the contract was wrongfully terminated, it is still at an end; the wrongful termination, however, gives rise to a claim on behalf of the aggrieved party.

The importance of this distinction is confirmed when we consult the Agreement before us. Termination can take place upon the occurrence of any one of a list of events. See Agreement § 4.2. While other occurrences might give rise to a lawsuit and damages, only certain enumerated breaches of contract are regarded as serious enough to justify termination. NAL and Benner might have waived their rights under the Agreement by refraining from exercising the right to terminate under § 4.2, but they did not: by claiming termination, they demonstrated that they were not willing to overlook EraGen's failure to perform.

This district court appeared to conflate breach and termination in analyzing the waiver issue. Although that

is understandable given how closely related they are in this contract, it is still error. We find that NAL did not waive its right to terminate the Agreement, and thus that there is a live question before us whether the steps that it took were effective to bring about termination.

## II

So far we have assumed that the Agreement was properly terminated; we now turn to examining that assumption to see if it is correct. At this point, the wording of the Agreement becomes important. We proceed in two steps: first, were there proper grounds for termination, and second, if so, did NAL properly communicate the fact that it was exercising its right to terminate? "In contract interpretation cases, we review a district court's interpretation of an unambiguous contract *de novo*. . . . If the contract is ambiguous, a more deferential standard of review is applied to the interpretation of the terms and factual findings." *Platinum Tech., Inc. v. Federal Ins. Co.*, 282 F.3d 927, 931 (7th Cir. 2002) (citation omitted).

The provision governing termination is § 4.2 of the Agreement:

> Benner may terminate this Agreement upon written notice to EraGen upon:
>
> A. non-payment of the payments due Benner under Sections 3.1, 3.2, 3.3 and 3.4, and 5.3, provided that EraGen or its designee shall have the right to cure such breach within sixty (60) days of EraGen receiving written notice from Benner;

. . . .

> Upon termination of this Agreement pursuant to
> Section 4.2, all of the rights in the Licensed Patents and
> Know How will revert to Benner, subject only to
> Benner's obligations to sublicensees [enumerated
> elsewhere].

An underpayment of royalties would constitute a breach, giving EraGen a period during which it had a right to cure after it was notified. Here, Benner promptly notified EraGen on the day after he received the check, September 2, 2005, of his conclusion that there had been an underpayment, triggering a cure period ending November 2, 2005: on that date the contract would automatically terminate.

We must refer to the words of the contract to see whether this sequence of events supported termination. Benner believed that he had been underpaid, and thus that he was permitted to declare EraGen in breach and to invoke § 4.2; EraGen was convinced that there was no breach, and that it had actually overpaid Benner. It has always asserted that no proper ground for termination existed, and so, it concludes, Benner was not entitled to terminate the contract.

The primary reason for the frustrating lack of clarity about this situation is that EraGen failed to furnish the royalty report required by the licensing agreement with its September 1, 2005, royalty payment. When he saw the amount tendered, Benner computed the amount that he (and NAL, given that the rights had been assigned by this point) thought were owed based on several publicly

available sources. Benner came up with a number approximately $3,416 greater than the amount of the check; most of the difference was attributable to royalties from the AEGIS licenses. Meanwhile, on September 7, 2005, EraGen sent a letter to Benner asserting that it had underpaid on several sublicenses but overpaid on an existing Bayer sublicense, for a net overpayment of approximately $40,000 (later amended to $50,000 after an analysis by a certified public accountant; we are also still setting aside the "missing" cystic fibrosis sublicense).

The greatest part of the discrepancy between the competing totals comes from the parties' difference of opinion about the proper interpretation of the term "accruing" in § 3.7 of the Agreement. Section 3.7 is a timing clause, designed to specify when a higher royalty rate would come into effect. It said that a higher royalty rate would be paid on "all revenues *accruing* from Net Sales or sublicensing . . . on or after February 15, 2005." Agreement § 3.7 (emphasis added). The money from the Bayer sublicense in question was booked before February 15, but actually reached EraGen's accounts after February 15. EraGen asserts that § 3.7 was using the term "accruing" in the accountant's sense, under which the royalties would be paid on the lower pre-February 15 rate for all transactions booked before that date. Benner asserts that the "plain meaning" of the term implies cash-in-hand. Revenues, he thinks, did not accrue from sales until the sale was complete and payment made. The district court accepted Benner's position, but we think that this puts too much of a strain on the language the parties chose for their contract.

First, we note that the distinction between accrual and cash basis transactions is a common one in the business world: some people keep track of transactions as they are booked (accrual businesses), and others keep track of them as money is spent or collected (cash businesses). Without evidence to the contrary, we see no reason to assume that the parties to the AEGIS Agreement chose to use the word "accrual" idiosyncratically to mean "cash basis." Second, neither party disputes that EraGen uses the accrual method of accounting and that Benner knew this. Benner sat on EraGen's board of directors long enough both to see that this was the case and to understand what it meant. The Florida Supreme Court has also expressed no doubt that the term "accrued," especially when used against a background of accounting, means "an item . . . definitely ascertained as to its amount, and acknowledged to be due," *Orlando Orange Groves Co. v. Hale*, 119 Fla. 159 (1935). In the AEGIS Agreement, the term "received" (rather than accrued or accruing) is used elsewhere in the document, see, *e.g.*, Agreement §§ 3.4, 3.10, raising a strong inference that the use of "accruing" in § 3.7 was for a specific reason. The parties here are sophisticated enough to make us reluctant to assume that they meant nothing by their choice of words in a fully-dickered document. The description of the royalty payments in § 3.9 confirms that the royalties are paid for periods "in which such amounts were earned," not when they were actually received. There is sufficient information within the Agreement to raise a strong inference that the term is not even ambiguous.

Even if we were to assume, generously, that the term "accrued" is ambiguous and thus that we should resort to

parol evidence to prove its meaning, the balance tilts strongly in favor of an interpretation following the accounting convention. This was not the parties' first shot at a contract. They had concluded a previous agreement that had failed because EraGen did not pay its royalties on time. The issue of timely payment was on the table and both Benner and NAL had every incentive to be crystal clear on the timing issue. Indeed, Benner seemed to interpret the clause in the accounting sense. In a letter written October 24, 2005, concerning the timing of royalties, Benner even asked whether the Bayer royalty money "was on EraGen's books as accrued income before February 15" because this would "determine[ ] the royalty rate." Moreover, it was NAL's own lawyers who inserted the phrase "revenues accruing from Net Sales" in place of the single word "transactions." Because this is a patent license agreement, the relevant transactions are the sales of products using the licensed technologies to third parties. Such a transaction takes place at the moment the product is sold, which is also when EraGen realizes its revenue. This matches with the normal business definition of "accruing," but not with a reading that takes "accruing" to mean actual receipt of funds.

   With all of this parol evidence in hand, the weight of the arguments favoring the "accounting" meaning overpowers the countervailing notion that the district court drew from the fact that the Agreement did not specifically state that it was using "accruing" in a technical sense. The district court found both readings of the term plausible, but it favored the plain meaning offered by Benner and NAL. We find both possible, but only one plausible. In the

context of a clause dealing with the financial details of a carefully negotiated contract between parties that had been doing business together for years, a shift in wording between "accruing" and "received" cannot be disregarded. The term is unambiguous, and thus the district court erred when it found that the term "accruing" referred to actual revenues received, rather than revenues booked.

This conclusion has several consequences. Benner based his termination of the Agreement on a mistake, putting to one side for the moment the cystic fibrosis sublicense (to which we return below). He thought that EraGen had underpaid royalties, but when one draws the line between the old royalty rate and the new one using accrued transactions, it appears that EraGen indeed overpaid by approximately $50,000. This does not mean that Benner's notice of termination was ineffective, but it does mean that Benner may have ended the Agreement wrongfully.

### III

Benner and NAL offer a second ground that, in their view, demonstrates that the termination was justified. They assert that EraGen failed to abide by the section of the Agreement requiring it to maintain the proper filings with the Patent and Trademark Office ("PTO"). Section 5.3 of the Agreement provides that EraGen must pay the maintenance fees for the patents and, if necessary, take care of changing the status of the holding organization from that of a "small" entity to a "large" entity. (Certain fees are higher when patent licenses are held or practiced

by large entities rather than small ones. See 37 C.F.R. § 1.20(e)-(h). When the patents and licenses were practiced only by EraGen or Sulfonics, they were held by a small entity. Bayer, however, is indisputably a large entity, and so once it had rights to the patents, the filings had to be corrected to reflect its role.) One of the grounds for terminating the Agreement is the failure to maintain the proper filings, including information about entity status, with the PTO. See Agreement § 4.2.A. Importantly, this is a section that requires written notice of the breach and gives a right to cure within 60 days of receipt of the notice.

NAL wrote one letter to EraGen on October 24, in which it asserted that "EraGen has not made payments due under Sections 3.1, 3.2, 3.3 and 3.4, and 5.3. Under Article 4.2 of the Agreement, failure to make these payments is sufficient grounds for termination. Therefore, the notice of Termination, dated September 2, 2005, stands." Later, it complained more specifically to EraGen in a letter of November 27, 2005, that EraGen had failed to comply with its obligations under Article 5.3. EraGen followed up with some emails seeking Benner's cooperation in correcting the PTO problems, and by March 4, 2006, it had completed corrective action. The PTO accepted the payments and corrected the patents with no prejudice to the holders and no net penalties.

NAL maintains that the fees should have been paid in March 2005, but it is unclear where in the contract it found that deadline. The only clause mentioning a time for payment says that the maintenance fees must be paid within two months of becoming payable. Agreement § 5.3.

Neither party addresses the date to which this might refer. Moreover, the Agreement imposes no deadline for changing the status of the entities holding the patents.

More significantly, we agree with the district court that NAL and Benner provided no notice whatsoever to EraGen that it might have breached this part of the contract, and so it never had the chance to cure its failure to perform and avoid termination. NAL contends the October 24 letter sufficed to give EraGen written notice, because it mentioned § 5.3 at the end of the laundry list of provisions under which EraGen had supposedly failed to pay. (Actually, the list more or less quotes § 4.2 of the Agreement.) It is asking far too much of EraGen (or any other party) to read into that fleeting reference a claim that an obligation—never before mentioned and even then not discussed at all—was being used as grounds for termination. Such a reading would render meaningless EraGen's right to cure violations of § 5.3. The correspondence that had gone before, as well as that which succeeded the October 24 letter, mentioned only the royalty underpayment as a ground for termination. We conclude that the breach now alleged of § 5.3 did not support termination, because NAL's notice to EraGen was insufficient.

## IV

At this point, we must confront the cystic fibrosis sublicense. What was it? Was it covered by the AEGIS agreement? What happened to the royalties that were collected from Bayer? The question pervades both parties' briefs because this large chunk of money ($525,000) has the

potential to make all the difference to the outcome of this litigation. If, as EraGen contends, the cystic fibrosis sublicense was outside the scope of the AEGIS Agreement, then NAL and Benner wrongfully terminated the Agreement and the district court's judgment in favor of NAL on this point was wrong: NAL would owe approximately $49,383 to EraGen. If, on the other hand, as Benner contends, EraGen wrongfully concealed from Benner and NAL the existence of the cystic fibrosis sublicense and that sublicense was indeed covered by the AEGIS Agreement, then Benner's conclusion that EraGen underpaid the royalties due is probably correct, even if not for the reasons he originally gave. The problem we face is that the district court did not address this sublicense or the money attributable to it.

According to documents in the district court record, on March 24, 2005, EraGen and Bayer concluded a sublicense that pertained specifically to cystic fibrosis research. On April 27, 2005, the new Agreement between EraGen and Benner was signed. That Agreement included a warranty that EraGen would enumerate all of the sublicensees it held for the AEGIS patents. When EraGen compiled the list, however, it did not include the Bayer cystic fibrosis sublicense. It now explains the omission with an assertion that the Bayer license did not cover the AEGIS technology. NAL later found some evidence to the contrary, in the form of a "press release indicating that the cystic fibrosis sublicense uses AEGIS technology." Our attempts to locate this press release in the record on appeal were unavailing, but we did find another piece of potentially relevant evidence: NAL pointed out that Irene Hrusovsky,

EraGen's CEO, stated that 95% of EraGen's revenue came from sublicenses using the AEGIS technology. NAL reasons that this percentage is mathematically possible only if the $525,000 from the cystic fibrosis sublicense is included among the AEGIS sublicenses, even though Hrusovsky elsewhere denied that connection. This is intriguing evidence, but it is not enough to allow us to determine definitively whether EraGen was correctly keeping the cystic fibrosis sublicense out of the AEGIS royalty pool or was duplicitously attempting to hide the revenue from NAL and Benner.

EraGen argues that we should read the district court's silence as a *sub silentio* rejection of NAL's claim that this money is rightly due. This strikes us as entirely out of the question. This issue arose late in the litigation because EraGen was taking the position that the sublicense did not use the AEGIS technology and that it was somehow entitled to keep all information pertaining to the cystic fibrosis sublicense away from its adversary and the district court. When facts about the sublicense began to emerge, it became clear that the question whether it rested in part on the AEGIS technology was a serious one. Combing through the district court record, we have satisfied ourselves that the issue was presented to the district court, but for reasons that do not appear on the record, it received no resolution. Because a decision one way or the other on this sublicense will effectively decide the case, we cannot leave it up in the air.

## V

We therefore VACATE the judgment of the district court and REMAND this case for further proceedings consistent with this opinion. We have established the fact that Benner and NAL did terminate the AEGIS Agreement, but the question whether that termination was wrongful depends on the proper characterization of the cystic fibrosis sublicense. That issue will also determine whether Benner owes money to EraGen, or if EraGen underpaid royalties to Benner and NAL. Each party is to bear its own costs on appeal.