In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-2889

PRONSCHINSKE TRUST
DATED MARCH 21, 1995,

*Plaintiff-Appellant,*

*v.*

KAW VALLEY COMPANIES, INCORPORATED,
and KC PROPPANTS, LLC,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:16-cv-00640-slc — **Stephen L. Crocker**, *Magistrate Judge.*

_____

ARGUED FEBRUARY 22, 2018 — DECIDED AUGUST 10, 2018

_____

Before BAUER, EASTERBROOK, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* In June 2012, Ivan and Beverly Pronschinske through their trust, the Pronschinske Trust Dated March 21, 1995 (hereinafter "Pronschinske"), entered into a Mining Leasing Agreement ("the lease") with Kaw Valley Companies ("Kaw Valley"). The land owned by Pronschinske contained frac sand, useful to gas and oil

fracking operations, and the lease gave Kaw Valley the right to mine the sand, stone and rock products, but also provided that it was not obligated to extract any materials or sell any product by virtue of the lease.

Kaw Valley ultimately decided not to mine the land and terminated the lease through its provisions, but Pronschinske brought a contract action in district court alleging that Kaw Valley owed $400,000 under the lease provisions that required payment of a Commencement Royalty credit and a Minimum Production Royalty. The district court granted summary judgment for Kaw Valley, holding that under the terms of the lease neither payment was owed. On appeal, Pronschinske argues only that the court erred in determining that the Minimum Production Royalties were not owed. No claim to the Commencement Royalty credit is raised in this appeal. Both parties agree that the language of the lease agreement is unambiguous and controls the disposition of this contract claim, but the parties are diametrically opposed as to what that language unambiguously requires.

The lease grants to Kaw Valley the exclusive rights to "quarry, process, crush, manufacture, wash, remove and sell ('mine' or 'quarry') all sand, gravel, stone and other rock products from the Property" under the terms set forth in the lease. It provides for an initial term of 5 years, commencing on the lease's Effective Date (with automatic continuation under certain defined circumstances), but allows for early termination. Pursuant to the lease, Kaw Valley engaged in actions in preparation for mining, including: surveying the property; conducting well checks; taking soil borings; entering into an agreement to pay for an upgrade of County Highway N; and paying for the widening of the road that accesses the

property. It expended approximately $750,000 in preparing to operate the mine, primarily on engineering costs. It eventually determined that mining on the property was not commercially feasible or practical, and exercised its right to terminate the lease. The issue in this case is whether payments are owed to Pronschinske that were incurred while the lease was in effect.

The lease provides for payments to be made to Pronschinske at various stages of the mining process, including the Initial Royalty Credit, Commencement Royalty Credit, and Production Royalties. The Initial Royalty Credit is payable "[c]oncurrently with the execution of this Lease," and mandates a payment of $20,000 "as consideration for the entering into of this Lease." Lease ¶ 3. The agreement further provides that "[t]he Initial Royalty Credit shall be nonrefundable, but shall be used to offset any future amounts and royalties due Lessor from Lessee." *Id*. Therefore, that payment is a credit against future payments or royalties owed to Pronschinske, and was paid by Kaw Valley as required under the lease.

The lease provided for another credit, the Commencement Royalty Credit in the amount of $45,000, payable "[u]pon commencement of mine or quarry operations, as determined by Lessee in its reasonable discretion." Lease, ¶ 5. As with the Initial Royalty Credit, the lease provided that "[t]he Commencement Royalty Credit shall be nonrefundable, but shall be used to offset any future amounts and royalties due Lessor from Lessee." *Id*. Pronschinske does not argue on appeal that Kaw Valley owes it the Commencement Royalty Credit.

That brings us to the potential payments at issue here, which are found in the next paragraph of the lease—

paragraph 6. We set forth the provision in its entirety, with
the language relied upon by Pronschinske italicized:

> 6.      Lessee shall pay Lessor a royalty of
> $1.50/ton (2,000 lbs.) for the first 65,000 ton of
> sand, stone and rock products mined from the
> Property in satisfaction of the offset require-
> ments for the Initial Royalty Credit and Com-
> mencement Royalty Credit. Thereafter Lessee
> shall pay Lessor a royalty of $2.50/ton (2,000
> lbs.) for sand, stone and rock products mined
> from the Property (all such royalties are herein-
> after referred to as "Production Royalties") for
> the sand, stone and rock products mined from
> the Property weekly (measured from the Effec-
> tive Date). Lessee shall make such payments to
> Lessor no later than the Friday following the
> week in which products are mined from the
> Property. *Notwithstanding anything to the con-*
> *trary contained herein, Lessee shall pay to Lessor an*
> *annual minimum Production Royalty of $75,000.00*
> *(the "Minimum Production Royalty").* In the event
> that, as of the month containing the anniversary
> date of the Effective Date, the monthly Produc-
> tion Royalties (as such may be prorated) fail to
> meet or exceed the Minimum Production Roy-
> alty, Lessee shall pay to Lessor the difference be-
> tween the actual amount paid to Lessor during
> that year and the Minimum Production Royalty
> for such year. This catch-up payment will be

>   made with the next monthly payment due here-
>   under.

Lease, ¶ 6 (emphasis added).

Pronschinske argues that the italicized language reflects a stand-alone requirement of a minimum annual payment of $75,000 beginning with the first anniversary of the Effective Date, regardless of what actions are taking place on the property. It reads the "[n]otwithstanding anything to the contrary contained herein" language as meaning that its location in paragraph 6 is irrelevant and that it represents a minimum annual payment unconnected to Production Royalties generally. Kaw Valley, however, argues that the "notwithstanding" language references the paragraph in which it is found, and should be read as stating that notwithstanding the calculation of Production Royalties in this paragraph, a minimum payment of $75,000 is owed once the Production Royalty provision is triggered. In other words, Kaw Valley argues that it merely sets a floor for Production Royalties once owed, which applies only when product begins to be mined from the property as set forth in paragraph 6.

As Pronschinske recognizes, under Wisconsin law "[t]he general rule as to construction of contracts is that the meaning of particular provisions in the contract is to be ascertained with reference to the contract as a whole." *Tempelis v. Aetna Cas. & Sur. Co.*, 485 N.W.2d 217, 220 (Wis. 1992); *First Nat'l Bank of Manitowoc v. Cincinnati Ins. Co.*, 485 F.3d 971, 976 (7th Cir. 2007); *Folkman v. Quamme*, 665 N.W.2d 857, 866 (Wis. 2003). Moreover, we must give contract terms their plain or ordinary meaning. *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006). Where, as here, the contract is unambiguous, "our attempt to determine the parties' intent ends with the four

corners of the contract, without consideration of extrinsic evidence." *Id*. Therefore, the language in the contract at issue here must be read in context and given its plain meaning. "'[W]e review a district court's interpretation of an unambiguous contract *de novo*.'" *EraGen Biosciences, Inc. v. Nucleic Acids Licensing LLC*, 540 F.3d 694, 698 (7th Cir. 2008), quoting *Platinum Tech., Inc. v. Federal Ins. Co.*, 282 F.3d 927, 931 (7th Cir. 2002).

Reading the language in context, the district court properly determined that the Production Royalty payments were not owed in this case because no mining had begun on the property as set forth in paragraph 6. First, the placement of the sentence, in the middle of paragraph 6 after the price per ton calculations that are due for products mined from the property, indicates that the language refers to those payment calculations, and the "anything … herein" language refers to "anything within this paragraph" not "anything within this contract." If the provision was meant to provide a minimum payment due each year on the anniversary of the effective date, one would expect that to be set forth separately.

Moreover, the language in the sentence provides for "an annual minimum Production Royalty of $75,000.00" not "an annual minimum payment" or even "an annual minimum royalty payment." Lease, ¶ 6. It is characterized as a "Production Royalty," which is defined in that paragraph as a royalty due for the tons of sand, stone and rock products mined from the property. By its definition, then, it is inapplicable before the mining commences. And the word "minimum" is not capitalized when used in defining the payment (as opposed to in the parenthetical when "Minimum Production Royalty" is termed as the shorthand reference). Here, again, is the

sentence as a whole: "Notwithstanding anything to the contrary contained herein, Lessee shall pay to Lessor an annual minimum Production Royalty of $75,000.00 (the "Minimum Production Royalty")." The uncapitalized word "minimum" therefore is an adjective to the term "Production Royalty" in the sentence, thus setting a minimum, or floor, for Production Royalties in the paragraph. That interpretation is furthered by the sentence that follows which makes clear that when the Production Royalties fail to meet or exceed the Minimum Production Royalty as of the anniversary of the Effective Date, then the difference between the two must be paid – language which is consistent with the payment representing a floor for Production Royalties. It is, as the last sentence explicitly states, a "catch-up payment" when the Production Royalties do not meet expectations.

The structure of the rest of the lease furthers this reading of the language. First, in the lease as a whole, separate payments are set forth in separate paragraphs, with the Initial Royalty Credit, Commencement Royalty Credit, and Production Royalties set forth in paragraphs 3, 5, and 6, respectively (paragraph 4 is a nullity, stating only "Intentionally Deleted"). (It similarly sets forth a payment provision for products mined elsewhere but transported over Pronschinske's property in paragraph 7.) It would be nonsensical to place a minimum payment provision of $75,000—which exceeds both the Initial Royalty Credit and Commencement Royalty Credit in amount and applies each year rather than as a one-time credit – in the middle of a paragraph on Production Royalties when the other forms of payments are set forth in independent paragraphs.

And it would render those credits relatively meaningless. The Initial Royalty Credit and Commencement Royalty Credit are "used to offset any future amounts and royalties due Lessor from Lessee." Lease , ¶¶ 3,4. If a minimum royalty payment was paid annually, that offset would occur within the year automatically, making the payments of minimal significance. Rather than a credit to the Lessor until mining begins, the credits would merely be a short-term advance on the minimum payment that would be paid within that year.

Moreover, that reading cannot coexist with the first sentence of paragraph 6, which states that a Production Royalty of $1.50/ton should be paid for the first 65,000 tons of sand, stone and rocks mined "in satisfaction of the offset requirements for the Initial Royalty Credit and Commencement Royalty Credit," and thereafter a royalty of $2.50 per ton is to be paid. That paragraph therefore alters the payment of the mined products by $1 per ton for the first 65,000 tons, thus reducing the payments due to the Lessor by $65,000. That $65,000 is the amount owed to offset the $20,000 Initial Royalty Credit and the $45,000 Commencement Royalty Credit; yet if the Minimum Production Royalty applied as a minimum annual payment from year one, those credits would have already been offset in the year that they were paid – by deducting them from that Minimum Royalty Payment for the year. Paragraph 6 sets forth that payment amount without exception and without any provision for the possibility that some of the credits would have been offset already, thus making clear that until that time the credits would not have been offset by any other payments. That payment scheme is thus inconsistent with a reading of the lease that would recognize an annual minimum payment due from the start of the lease. See *DeWitt Ross & Stevens, S.C. v. Galaxy Gaming & Racing Ltd.*

*P'ship*, 682 N.W.2d 839, 849 (Wis. 2004) ("[c]ontracts must be read in such a manner as to give a reasonable meaning to each provision and without rendering any portion superfluous.")

Finally, paragraph 9 of the lease provides that: "[t]he royalties payable under paragraph 6 and paragraph 7 shall be payable based on the removal from (or transportation across) the Property." That sentence creates no exception for the Minimum Royalty Payment, and reinforces the reading of paragraph 6 as providing for a minimum payment only once product is mined from the property.

Accordingly, the district court properly held that Kaw Valley did not owe any Production Royalty payments to Pronschinske, and its determination is consistent with the clear language and structure of the lease.

The decision of the district court is AFFIRMED.